Gorman Dale OSBORNE, Administrator of the Estate of Sammy Hubbard, Lynn Hubbard, individually and Lynn Hubbard as guardian and next of kin for Katie Hubbard and Seth Hubbard, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. CIV. A. 2:99–0759.

United States District Court,
S.D. West Virginia,
Charleston Division.

Aug. 23, 2001.

Joshua I. Barrett, Esquire, J. Timothy DiPiero, Sean P. McGinley, Mary S. Blaydes, DiTrapano Barrett & DiPiero, Charleston, WV, for Gorman Dale Osborne, Administrator of the Estate of, Sammy Hubbard, Lynn Hubbard, individually and, Lynn Hubbard, as guardian and next of kin for, Katie Hubbard, and, Seth Hubbard, plaintiffs.

Stephen M. Horn, Assistant U.S. Attorney, Rebecca A. Betts, Esquire, United States Attorney, Charleston, WV, Thomas E. Esposito, Esposito & Esposito, Logan, for United States of America, (substituted for the Community Health Foundation of Man, Inc., a Corporation, and Dr. Prakob Srichai), and, Terry Hoosier, defendants.

### *MEMORANDUM OPINION AND ORDER*

HADEN, Chief Judge.

This medical malpractice action brought against the United States under the Federal Tort Claims Act ("FTCA") arises out of the negligent medical treatment rendered to Terry Hoosier by Prakob Srichai, M.D., an employee and agent of the United States. On July 20, 1997, while under the influence of addictive medications prescribed by Dr. Srichai, Hoosier drove his pick-up truck into oncoming traffic and collided head-on with the automobile driv-

en by Sammy Hubbard. Sammy Hubbard was killed, his wife Lynn was severely and permanently injured, and his daughter Katie was left paralyzed. The Hubbard's nineteen-day-old son, Seth, miraculously escaped unharmed.

The case was tried to the Court on July 17 through July 20, 2001. Having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, the Court makes its Findings of Fact and Conclusions of Law in accordance with Fed. R.Civ.P. 52(a).

## I. PROCEDURAL BACKGROUND

On August 2, 1999 Plaintiffs filed an Amended Complaint in the Circuit Court of Logan County against the Community Health Foundation of Man, Inc. ("CHF") and Dr. Srichai alleging medical negligence for Dr. Srichai's treatment of Terry Hoosier.[1] The action was removed to this Court on September 9, 1999 because CHF was a federally funded program under the United States Department of Health and Human Services and as such, this Court has exclusive jurisdiction over the action under the FTCA, 42 U.S.C. § 233.

Upon motion by CHF and Dr. Srichai, which provided certification that CHF was an agent of the United States and that its employee, Dr. Srichai, was an employee of CHF acting within the scope of his employment, CHF and Dr. Srichai were dismissed and the United States was substituted in their stead. Based upon this substitution, any finding made against Dr. Srichai is a finding against the United States and binds it accordingly.

At the time the United States moved to be substituted for CHF and Dr. Srichai, it also moved to dismiss, arguing West Virginia does not recognize a cause of action for medical negligence against a physician by a third-party/non-patient. The Court initially agreed and dismissed the action against the United States. However, Plaintiffs moved for reconsideration asserting the West Virginia Medical Professional Liability Act ("MPLA"), codified at *West Virginia Code § 55–7B–1 et seq.*, contemplated such a claim by virtue of its definition of "medical professional liability." W.Va.Code § 55–7B–2(d). This time, the Court was persuaded, granted the motion for reconsideration, and reinstated the case.

At the summary judgment stage, the United States again argued West Virginia jurisprudence does not recognize such a claim. For reasons set forth in its May 2, 2001 Memorandum Opinion and Order, the Court denied the United States' motion for summary judgment and the case proceeded to trial.

## II. FINDINGS OF FACT

### A. *Hoosier Treatment and Care*

For nearly seventeen years preceding the July 20, 1997 accident, Terry Hoosier was a patient of Dr. Srichai. Dr. Srichai first saw Hoosier on May 22, 1980 when Hoosier's chief complaint was low back pain. At that time, Dr. Srichai prescribed Valium and Empirin # 4. Vol. I, TH–00015. By December 18, 1980, Dr. Srichai began noting Hoosier's increasing demands for pain medication, "Terry Hoosier said he would not ask for any more pain pills after this prescription unless definitely needed." Vol. I, TH–00021. In the six months prior, at least two doctors at Appa-

---

1. Plaintiffs' Amended Complaint also asserted negligence claims against Terry Hoosier. After discovery was concluded and dispositive motions were filed, the parties jointly submit-

ted a proposed Agreed Order of Dismissal of Terry Hoosier, which the Court entered on April 5, 2001. The case then proceeded solely against the United States under the FTCA.

lachian Regional Hospital's ("ARH") emergency room noted a "demerol addiction" or "narcotics addiction" on Hoosier's chart. *See* Vol. II, TH–00572, TH–00574, TH–00577 (During visits on 8/30/80, 9/30/80, and 11/18/80, Dr. Reddy notes "demerol addiction" on Hoosier's record); *see also* Vol. II, TH–00578 (On 7–8–80, the attending physician notes "? Addiction to narcotics.") (question mark in original.)

In February of 1981, Hoosier returned to the ARH emergency room after he fell out of bed and injured his right hand. He was seen by a doctor who observed, "Patient is known to have lots of entries in the clinic indicating drug addiction." The diagnosis was "Drug Addiction" and "Fracture of the Right Index." Vol. II, TH–00566.

Despite ample evidence Hoosier suffered from a drug addiction, on July 12, 1982, Dr. Srichai prescribed Tylenol # 4, an addictive pain medication. Thereafter on September 13, 1982, Dr. Srichai noted "Patient wants pain medication" and then prescribed Tylenol with Codeine. Vol. I, TH–00049.

Throughout 1983, records reveal Dr. Srichai routinely prescribed Valium and Percocet or Percodan. However, on August 31, 1983, Dr. Srichai noted and underlined for emphasis *"No more percocet for now."* Vol. I, TH–00090. By September 14, 1984, Hoosier was again receiving Tylenol # 4, Vol. I, TH–00096, and by December he was back on Percocet under the care of Dr. Srichai. Vol. I, TH–00098. Hoosier received Percocet and Valium almost monthly for the next year for what Dr. Srichai described as chronic low back and neck pain. *See* Vol. I, TH–00099–110, TH–00117, TH–00121.

Despite allegedly suffering from severe, chronic lower back pain, Hoosier often showed up in the emergency room complaining of curious injuries. For example,

on July 23, 1982, Hoosier was admitted to Man ARH by Dr. Srichai for a lower back injury and numbness to right leg, suffered while playing football. Vol. II, TH–00526. Similarly, on October 7, 1985, Dr. Srichai admitted Hoosier to Man ARH for a lower back injury suffered "when he fell down the mountain ... while he was squirrel hunting." Vol. II, TH–00487. According to Plaintiffs' expert, Dr. Gregory Rosencrance, these injuries should have served as "red flags" to Dr. Srichai, causing him to question Hoosier's continual complaints of severe back pain and to consider seriously that Hoosier was simply seeking drugs.

In addition to being aware that Hoosier was addicted to pain medication, Dr. Srichai routinely recognized that Hoosier was also abusing alcohol. *See, e.g.,* Vol. I, TH–00146 (During 8/28/86 visit, Dr. Srichai notes smell of alcohol on Terry Hoosier's breath.); Vol. I, TH–00171–72 (During 9/2/88 visit, Dr. Srichai notes Hoosier is "nervous" and "under influence of alcohol," and advises, "If need to please come back when he [sic] recovery [sic] from his alcohol."); Vol. II, TH–00476 (During 10/27/88 visit, Dr. Srichai notes Hoosier "is known to have a problem with heavy drinking."); Vol. I, TH–00197–98 (During 2/8/94 visit, Dr. Srichai notes Hoosier is "still drinking but not heavy" and "[Hoosier] denies drinking but I believe that he still drinks occasionally at his home."); Vol. I, TH–00238–39 (During 10/15/96 visit, Dr. Srichai notes Hoosier was treated in the emergency room ten days earlier "under the influence of alcohol. [Hoosier] states that he fell and knocked his front teeth out and sustained a laceration of the left eyebrow." Dr. Srichai also notes Hoosier's "history of alcoholism with fall" and indicates that his blood alcohol level during the 10/5/96 emergency room visit was 0.183, "which is over the limit."); Vol. I,

TH–00247 (During 4/2/97 visit, Dr. Srichai notes Hoosier was injured "on 4/18/97 when he was intoxicated and fell on the sidewalk at 2:00 a.m.").

In 1989, Hoosier was convicted for cocaine distribution. *United States v. Hoosier*, Crim. No. 2:88–00158–03 (S.D.W.Va. 1989). He was sentenced by the undersigned to a period of incarceration for thirty-six months to be followed by a supervised release term of three years.

While imprisoned, Hoosier requested Dr. Srichai write the prison physician to recommend he be put on Xanax, a highly addictive tranquilizer. In a July 31, 1991 letter to Hoosier, Dr. Srichai declined to make the recommendation, stating that a psychiatrist would in a better position to prescribe such a medication. Regarding other medications, however, Dr. Srichai advised:

> About your high dose of Sinequan and Melleril that you told me was killing you and made you unable to think straight, you should discuss this with your doctor at the correctional center. Maybe the doctor could reduce the dosage down to an acceptable point for you. . . . *I would suggest to you that you should request the doctor in the correctional center to reduce your dosage of your medication so that you can function and think straight.* However, if you behave good at the correctional center, *you probably would not need any medication at all.* Just remember, the Xanax or any other tranquilizer of a similar class, will cause your behavior to be like you were drinking alcohol.

Vol. I, TH–00344 (emphasis added.)

On December 14, 1993, Dr. Srichai noted a "History of Drug Dependence" among other ailments and at that time prescribed Soma, an addictive muscle relaxant. Vol. I, TH–00195. On Hoosier's February 8, 1994 visit, Dr. Srichai again diagnosed him with chronic neck and low back pain with multiple arthritis, as well as anxiety depression and an old fracture of the right navicular bone, among other ailments. He then began prescribing Esgic, a pain reliever containing Butalbital, because "At this point, patient has so much pain and nothing else can handle his situation[.]" Vol. I, TH–00198. However, the objective medical evidence did not support the various aches and pains about which Hoosier routinely complained. *See, e.g.,* Vol. II, TH–00491, 508, 510, 513, 521, 528, 559, 570; Vol. III, TH–1062–63; Vol. IV, TH–001267 (all medical records, including x-ray results, which, despite Hoosier's complaints of back pain, were negative for any abnormality.)

Approximately three weeks later on March 1, 1994, Hoosier showed up at CHF complaining of a toothache and was seen by Dr. Maximo Fernan. Dr. Fernan reported, "Still having toothache. Wants some pain medication. This will be the last time I will give him pain medication. I WILL NOT SEE THIS PATIENT ANYMORE." Vol. I, TH–00202 (emphasis in original.)

Another three weeks later on March 22, 1994, Hoosier appeared at CHF complaining of aches and pains all over and was seen by another doctor. The record for this visit states, "Wants narcotic analgesics. [Patient] known by staff to be narcotic abuser." The diagnosis: (1) Chronic Neck and Low Back Pain; and (2) Drug Abuser. Vol. I, TH–00202. Hoosier was referred to the pain clinic and prescribed Oruvail and Soma. Vol. I, TH–00203.

In October of 1994, while serving his term of supervised release for his 1989 federal drug conviction, Hoosier's probation officer, Ruth E. LaBarth (now Loftis) notified all of Hoosier's physicians, including Dr. Srichai, concerning:

[Hoosier's] history of substance abuse and encourag[ed] that he be treated with non-habit forming medications. In addition I have received contact from various people within Mr. Hoosier's community and some health professionals who also believe Terry is abusing his medications.

Mr. Hoosier is required to submit to random urine drug screens. These screens have consistently tested positive for his use of codeine, morphine, butalbital, benzodiazepines, and on occasion hydromorphone. Of concern to me is Mr. Hoosier's consumption of alcohol while taking controlled narcotics.

Joint Exh., Tab 22 at USPO–00030 (La-Barth letter.)

At trial, Ms. Loftis testified she was concerned in 1994 about the potentially fatal result that might occur if Terry continued to drink alcohol and take the medications. Every time Ms. Loftis saw Hoosier he was clearly under the influence of either prescription medications or alcohol. She testified the purpose of the October 27, 1994 letter was to advise Hoosier's physicians he was mixing his medications with alcohol and to ensure that each physician was aware Hoosier was also using medications prescribed by other physicians. Loftis believed it was Hoosier's physicians who were controlling his medications and that Hoosier could not stop taking them on his own. She also testified she believed it was important to get Hoosier off the addictive prescription medications so he would not injure himself or others. Loftis felt that notifying Hoosier's doctors of his drug and alcohol addiction was the best solution.

Ms. Loftis testified one physician, Dr. Acorta, agreed to cease prescribing the habit-forming medication Klonopin. When Hoosier subsequently learned Dr. Acorta might cease prescribing Klonopin, he became very angry and asserted he would not be responsible for his actions.

As evidence of drug and alcohol abuse mounted, Hoosier was eventually placed in Southway, a 28-day drug and alcohol abuse treatment program at Thomas Memorial Hospital in South Charleston. After completing the program, Hoosier was discharged on December 1, 1994 with prescriptions for Klonopin and Esgic Plus. Unfortunately, he immediately reverted to abusing prescription medications and alcohol. He was arrested twice for D.U.I. within two weeks of discharge.

Further attempts to help Hoosier gain control of his drug and alcohol addiction were unavailing. Consequently, on January 25, 1995 Ms. Loftis petitioned the Court to revoke Hoosier's supervised release. The petition was based, in part, on Hoosier's conduct in obtaining controlled substances from emergency room physicians. Hoosier was served with the petition on February 1, 1995 and a revocation hearing was then scheduled for March 2, 1995. In the interim on February 7, 1995, Hoosier saw Dr. Srichai who noted, "[Hoosier] has been having on and off problems with the law judge and probation officer for reasons I do not want to mention." At this visit, Dr. Srichai prescribed Esgic Plus and Soma for Hoosier. Vol. I, TH–00223. When questioned at trial about this entry, Dr. Srichai testified he did not know what Terry Hoosier's problems were with the law judge and his probation officer.

At his revocation hearing on March 2, 1995, Hoosier admitted the continued use of controlled substances obtained from emergency room physicians in violation of the conditions of supervised release. The Court then found Hoosier to be unsupervisable and sentenced him to an eight month term of imprisonment.

Hoosier began his sentence at the Federal Medical Center in Lexington, Kentucky and upon arrival, was examined to determine if he was a proper candidate to be housed in a medical facility. Dr. Jeanne Dertinger, D.O., found that: "[Terry Hoosier] is definitely not a medical case. He is a psychiatric case. He does not need to be placed in a chronic medical care facility and should be released from that status immediately." Vol. IV, p. 1412 (Addendum to Medical Summary). While incarcerated at FMC Lexington, Hoosier was weaned from all medications he had been taking for years, including Klonopin. Vol. IV, TH–001338.

On October 30, 1995 Hoosier was discharged from FMC Lexington with no prescriptions. Only seven days later, Hoosier saw Dr. Srichai and told him that while he was in prison, he was treated by a doctor who prescribed him Tylenol # 4, Klonopin, Soma, Proventil, Atrovent, cholesterol medication twice a day and Zantac twice a day. Because his psychiatrist, Dr. Diaz, had moved elsewhere, Hoosier also requested medication from Dr. Srichai for his nervous condition and depression. Vol. I, TH–00227.

On November 6, 1995, based on a diagnosis of chronic low back pain, degenerative arthritis of the spine, old navicular fracture of the right wrist, and other ailments, Dr. Srichai prescribed nine medications, including Soma, Esgic Plus, and Klonopin. Dr. Srichai did not consult with any physician at FMC Lexington to confirm that Hoosier had been taking Tylenol # 4, Klonopin and Soma. If he had, he would have learned that Hoosier had not been released with any of those prescriptions.

On November 11, 1995, five days after Hoosier's visit to Dr. Srichai, Hoosier showed up at the ARH emergency room complaining that for the past 3 or 4 days,

"he hurt all over." Once again, Dr. Srichai was the attending physician. The record of this visit noted Hoosier had slurred speech, an unsteady gait and multiple complaints of pain. Significantly, no references were made to drinking or alcohol abuse. Dr. Srichai diagnosed Hoosier as having chronic low back pain, treated him with Phenergan, along with two other drugs, and sent him home. Vol. II, TH–00439. Dr. Rosencrance, Plaintiffs' expert, testified this visit should have raised yet another red flag, alerting Dr. Srichai that Hoosier was abusing prescription medication again and that Hoosier was in need of intervention and rehabilitation.

The next noteworthy visit to Dr. Srichai took place on April 22, 1996. In his clinic progress note, Dr. Srichai noted, "He complains of aches and pains all over his body. He also complains of diarrhea. He constantly requests narcotic pain medication but I did not prescribe it. He is very nervous and states he cannot sleep. He denies drinking." Vol. I, TR–00232. Dr. Srichai again prescribed addictive medications including Soma, Klonopin and Esgic Plus.

As further evidence of Terry Hoosier's obvious drug abuse, Hoosier himself testified he often had his prescriptions refilled early, a fact amply supported by the Towne Pharmacy records. *See e.g.*, Vol. V, TH–002178–79 (showing Hoosier received refills of Butalbital on 7/27/94 and again 26 days later, on 8/22/94; on 9/22/94 and again 25 days later, on 10/17/94; on 2/7/95 and again 21 days later, on 2/28/95; and 11/6/95 and again 24 days later, on 11/30/95). Hoosier testified that he "doubled up" on his medications often and that Dr. Srichai was aware of this practice. He agreed, however, that he sometimes exaggerated the severity of his pain to Dr. Srichai in order to obtain more prescription pain medication.

Kathleen Atkinson (now Holcomb), a pharmacist then employed by Towne Pharmacy, where Terry Hoosier routinely filled his prescriptions, testified she was concerned Hoosier was abusing his prescription medications. She based her concern on the fact that Hoosier often tried to get his prescriptions filled early; that he always had an excuse for seeking early prescriptions; and that, sometimes, he appeared at the pharmacy slurring his speech.

Deanna Blair, a pharmacy technician employed at Towne Pharmacy since 1991, testified Hoosier attempted to obtain his prescriptions at least eight days early every month. She expressed concern, also, that he was drinking and taking drugs he should not have been taking, and that one day, he might "hit" someone while under the influence. According to Ms. Blair, of the fifteen patients about whom the pharmacy personnel noted concerns about prescription drug dependency, ten were patients of Dr. Srichai.

Rachael Morgan, a licensed practical nurse who was employed by the hospital from 1987–98 and who worked primarily for Dr. Srichai, also testified regarding Srichai's reputation for over-prescribing addictive medications. Although her criticisms of Dr. Srichai were somewhat muted at trial, in her pretrial deposition she testified Dr. Srichai prescribed the combination of Soma (a muscle relaxant), Esgic Plus (a pain medication) and Klonopin (an anti-depressant) to many patients, a fact Ms. Morgan found "strange." Rachael Morgan Depo. p. 11. Ms. Morgan also testified Dr. Srichai had the reputation of prescribing too many prescription medications. (*Id.* p. 19–22).

On April 18, 1997 and again on May 15, 1997, Dr. Srichai prescribed a cough syrup containing Phenergan with Codeine for Hoosier. On May 13, 1997 and again on June 24, 1997, Hoosier was arrested for D.U.I.[2] Dr. Srichai claimed he was not aware of these two DUI arrests and had he known, he would not have prescribed Phenergan with Codeine.

On June 30, 1997, six days after the second DUI arrest, Dr. Srichai notes on Hoosier's chart: "a history of chronic alcoholism." Nonetheless, Dr. Srichai prescribed Soma (a muscle relaxer), Esgic Plus (a pain medication) and Klonopin (an anti-depressant and Schedule IV controlled substance), among ten other medications for Hoosier. The tragic accident, which generated this civil action, occurred twenty days later on July 20, 1997.

According to the testimony of Dr. Rosencrance and Kathleen Holden (pharmacist), Soma, Klonopin, Butalbital and Phenergan with Codeine are central nervous system (CNS) depressant drugs that create an enhanced effect, when taken in combination. The *Physicians' Desk Reference* ("*PDR*") specifically warns about prescribing Soma, Klonopin, and Codeine to addiction-prone individuals.

Although Dr. Srichai elected not to testify during Defendant's case-in-chief, Plaintiffs called him in their case as an adverse witness and questioned him concerning his personal relationship with Terry Hoosier. After denying such a relationship, Dr. Srichai admitted he had social interactions with Hoosier. On at least one occasion, Hoosier gave Dr. Srichai a Christmas gift and also attended one of Dr. Srichai's Christmas parties. Dr. Srichai once was a passenger on the rear seat of Hoosier's motorcycle as Hoosier operated it. Dr.

**2.** Hoosier testified he was under the influence of his medications, not alcohol, when he was arrested for D.U.I. on those dates.

Srichai also lent his automobile to Hoosier for two months while Hoosier either repaired it or had it repaired by another. On a different occasion, Hoosier loaned Srichai his vehicle. Dr. Srichai provided free medical care to one of Hoosier's girlfriends at Dr. Srichai's home and also gave Hoosier free drug samples on occasion. He once picked up Hoosier from a street in town and took him home when Hoosier obviously was impaired.

Dr. Srichai also displayed a filing cabinet full of unpaid invoices to Hoosier for medical care rendered by Srichai during his practice in Illinois. Srichai also shared with Hoosier that he was the recipient of free trips by drug companies. Finally, there were times when Dr. Srichai would lecture Hoosier that he, Hoosier, was a bad person. Dr. Srichai explained this comment by saying Hoosier claimed too many injuries and took advantage of Workers' Compensation and insurance companies.

Based on the foregoing, the Court makes the following **FINDINGS of FACT** regarding Hoosier's treatment and care by Dr. Srichai: (1) Terry Hoosier was a drug addict and polysubstance abuser who persistently abused the various medications prescribed by Dr. Srichai; (2) Hoosier was a binge drinker who abused alcohol on a regular basis; (3) Based upon both his personal and professional relationship with Hoosier, Dr. Srichai clearly was aware Hoosier was abusing his prescription drugs, as well as abusing alcohol; (4) Dr. Srichai also was fully aware Hoosier requested pain medication regularly to feed a drug addiction, as opposed to seeking treatment for legitimate injuries and ailments; (5) Dr. Srichai repeatedly prescribed addictive, CNS depressant drugs to Hoosier, despite an awareness that Hoosier was addicted to, and abusing, those medications; (6) Dr. Srichai had a reputa-

tion for liberally prescribing controlled substances to his patients, including Hoosier; (7) Dr. Srichai failed to cease prescribing addictive medications, after it was apparent Hoosier was abusing them; and (8) Dr. Srichai failed to take any action to rehabilitate Hoosier, but rather, assisted and nurtured Hoosier's drug dependency by continuing to prescribe routinely the addictive medications Hoosier requested.

### B. Warnings Given to Hoosier

According to the testimony of Rachael Morgan, Kathryn Endicott and Fredricka Mitchell, nurses employed by Dr. Srichai, Hoosier received several verbal and written warnings about not drinking and/or driving while using certain medications. Their testimony is corroborated by the aftercare instruction sheets in the medical record that Hoosier admitted signing. The nurses further testified, as a routine practice and at a minimum, Hoosier was given a copy of aftercare instruction sheets to take with him.

Pharmacist Kathleen Holden also testified she gave Hoosier medication instructions and side effect warnings. Accordingly, the Court also **FINDS** and **CONCLUDES** Hoosier was warned about the effects of his medications.

### C. The Day of the Accident

Terry Hoosier testified he did not sleep much during the night before the accident and that he ingested whatever medications he was taking at that time. He specifically recalls drinking nearly an entire bottle of Phenergan with Codeine, a prescription from Dr. Srichai. He could not recall the exact time he left his house on July 20 1997, but knows it was after 8:00 a.m.

Hoosier testified he stopped at Parts America at the Rita Mall where he purchased several auto accessories. He kept and then disclosed the receipt from the

parts store to corroborate his whereabouts the day of the accident. *See* Joint Ex., Tab 7. Aaron Burgess, the Parts America employee who served Hoosier that day, testified Hoosier appeared to be "on something" because he was staggering around and knocking items off the shelves. Although Burgess thought Hoosier appeared intoxicated, he did not smell alcohol on his person or observe any alcohol containers in Hoosier's vehicle. Consequently, Burgess did not notify police authorities of Hoosier's condition, because he did not detect alcohol and because Burgess's boss said Hoosier "had a mental problem and he was like that all the time." According to Burgess, Hoosier departed the Parts America premises and lot around 3:00 p.m.

Corroborating Hoosier's demeanor while in the parts store, the parties also submitted the statement of Samuel L. Oldaker, another Parts America employee. *See* Joint Ex., Tab 6B. Mr. Oldaker's recollection of Hoosier's condition comports with that of Mr. Burgess. Oldaker stated, in pertinent part:

> He [Hoosier] was staggering around and couldn't walk straight. He knocked some degreaser off the shelf. He and Aaron Burgess went out to his truck to check the air filter and when they came back in he almost fell over an ashtray and dropped his cigarette into a bucket of hand cleaner. . . . I couldn't smell any alcohol on him, but it was apparent he was wasted on something. He was also slurring his speech real bad. . . . He didn't appear to be in any better condition than when he first came in.

*Id.*

In another statement jointly submitted by the parties, Robbie Campbell testified he observed Hoosier pull his pick-up truck into a fire lane at the Rita Mall. As Hoosier exited his truck to go into the Parts America Store, "he was staggering really bad" and Campbell could tell Hoosier "was really intoxicated on something. He could barely walk." Later, when he exited the parts store, he was staggering still. Upon Hoosier's return to his truck, he stepped from the sidewalk next to the truck, reached to open the door and grasped the side of the truck to keep from falling to the pavement. Then, as Hoosier started to leave the fire lane, he almost struck a parked car. *See* Joint Ex., Tab 6B.

Shortly after leaving the auto parts store, Hoosier testified he was pulled over by Officer Matt Carter of the Man Police Department. According to Hoosier, Officer Carter walked up to his window and ordered him to "get out of town or he was going to take him to jail," presumably for DUI.

Hoosier then drove toward Buffalo Creek and stopped at Troghan's Service Station, where he purchased gasoline and a 32 ounce bottle of beer. Hoosier does not recall drinking the beer and maintains he did not ingest any alcohol the day of the accident. Hoosier then drove up Buffalo Creek to a friend's house. Hoosier's friend was not at home, so he proceeded to a hill, where he parked and "worked on his [disability claim] papers." Hoosier testified that he later remembered pulling onto the road but did not recall what happened up to the time of the accident. Hoosier unequivocally admitted he was impaired by the medications he ingested earlier that morning.

Kathy Bradford, who was driving ahead of Hoosier just prior to the accident, testified Hoosier was driving erratically, on both sides of the road and off the sides of the road. Fearful for her own safety, Ms. Bradford left the roadway and permitted Hoosier to pass her. Although she flashed her lights, blew her horn, and otherwise tried to alert Hoosier to his erratic driving, he failed to respond. Ms. Bradford then

reentered the highway and saw Hoosier driving "mostly" on the wrong side of the road. According to Ms. Bradford, Hoosier never applied his brakes, either prior to or at the moment of the accident, when Hoosier drove his truck into the Hubbards' vehicle. According to the accident report, the wreck occurred at 4:05 p.m.

Ms. Bradford testified that Hoosier did not appear to know what had occurred and aimlessly wandered around, picking up oil containers scattered by the wreck. Bradford did not observe beer containers in or around Hoosier's vehicle. Ms. Bradford testified the Hubbard driver was not at fault for the accident in any aspect.

Carol Hoosier[3] arrived at the scene of the accident at approximately 4:15 p.m. According to the written statement jointly submitted by the parties, when she first arrived, she "saw Terry Hoosier coming up off the creek bank and he had blood all over his face." *See* Joint Exh., Tab 6B. She further states:

> I tried to get Terry to sit down, but he wouldn't listen to me. He acted spaced out like he was in another world. His speech was slurred and [he was] staggering all over the place picking up cans. He said 'they got in my way' referring to the accident. I've known Terry for years and I have seen him both sober and intoxicated many times. There is no doubt in my mind that Terry was either drunk or on drugs at that time.... I was there about 30 minutes watching Terry, and in my opinion, he was stoned out of his mind on something. I don't think it was a bump on his head.

*Id.*

Willard W. Blankenship, a paramedic with the Logan Emergency Services,

treated Terry Hoosier at the scene and accompanied him later in the ambulance to Man Appalachian Regional Hospital. Blankenship testified that Hoosier "didn't act right." For example, Blankenship recalls Hoosier exclaiming, "Don't search me!" He apparently believed Blankenship was searching him instead of administering medical attention. While in the ambulance, Hoosier also stated, "I guess I'm going to jail." Although Mr. Blankenship was, at times, within inches of Terry Hoosier, he was unable to detect any alcohol on or about his person.

William Steve Simpkins of the Logan County Sheriff's Department was the investigating officer at the scene of the accident.[4] He testified he observed several open and unopened beer bottles inside and outside Hoosier's vehicle. He also testified he detected a slight odor of alcohol about Hoosier's person. Officer Simpkins further testified, at the hospital, Hoosier admitted he "had a couple of beers." This statement allegedly was made after Hoosier was advised of his *Miranda* rights and after he indicated he did not wish to make a statement. Officer Simpkins did not photograph any of the beer cans he purportedly viewed.

Finally, Officer Simpkins opined the Hubbards were not at fault for the accident. Kathy Bradford, who observed the accident occurrence, also testified as previously noted, the Hubbard driver was not at fault for the accident in any respect. The United States did not proffer any evidence or make any assertions the Hubbards were at fault. Accordingly, the Court **FINDS** the operator of the Hubbard vehicle did not proximately cause or contribute to the occurrence.

---

**3.** Officer Simpkins testified Carol Hoosier is related to Terry Hoosier by marriage, though he did not know the exact relationship.

**4.** Officer Simpkins and Lynn Hubbard's mother are first cousins.

### D. Blood Alcohol Tests

While at the hospital, Hoosier's blood was drawn to test for the presence of alcohol and/or drugs. Roberta Joan Gunnells, a medical lab technician who was working at Man Appalachian Hospital the evening of the accident, testified that Hoosier's blood was drawn, at the request of the police, at approximately 6:30 p.m. The emergency room doctor also requested a second blood "draw," which was performed at 7:20 p.m. Technician Gunnells twice tested the blood drawn at 6:30 p.m. for the presence of alcohol and the results were 0.0003 or "basically zero", according to Ms. Gunnells.

Jeffrey E. Osborne, a civilian employee of the West Virginia State Police Forensic Laboratory, testified that he, as well as his co-employee Jim White, also tested Hoosier's blood sample drawn at 6:30 p.m. Their tests registered zero blood alcohol, as well.

Based upon these tests results and the testimony of most witnesses,[5] who stated they did not smell any alcohol on or about Hoosier's person, the Court **FINDS** Defendant was not impaired by alcohol ingestion at the time of the occurrence on July 20, 1997.

### E. Drug Test Results

The State Police Toxicology Lab and National Medical Services, Inc. reported that Hoosier's blood drawn after the accident tested positive for Codeine, Butalbital, and Valium.

Butalbital (Esgic Plus) had been prescribed by Dr. Srichai just twenty days earlier on June 30, 1997. Earlier on April 18, 1997 and May 15, 1997, Dr. Srichai also prescribed Phenergan with Codeine. The source of the Valium remains unknown. The United States posited Hoosier stole Valium from his father, who had a prescription for the drug. According to pharmacy employee, Deanna Blair, the Hoosier family had a reputation for stealing one another's medications. Hoosier denied he stole his father's Valium or otherwise took Valium intentionally. Instead, he suggested the pharmacist may have given it to him accidentally.

Plaintiffs' expert, Lee H. Blum, Ph.D., a board certified forensic toxicologist, testified that laboratory tests he conducted on blood taken from Hoosier just following the accident revealed the presence of 8.2 micrograms per gram of Butalbital, or 1.6 micrograms per milliliter of whole blood; 190 nanograms per gram of Codeine, or 38 nanograms per milliliter of whole blood; 160 nanograms per gram of Diazepam (Valium), or 32 nanograms per milliliter of whole blood; and 200 nanograms per gram of Nordiazepam, or 40 nanograms per milliliter of whole blood. (Blum Depo., p. 13–19). In Dr. Blum's opinion, the Valium (Diazepam), Codeine and Butalbital each were found in quantities equivalent to therapeutic dosages. (Blum Depo. 15–16, 17, 37).

Dr. Blum opined that because more Nordiazepam than Diazepam was present in Hoosier's blood, it was more likely than not that the Diazepam (Valium) was ingested "at a remote time to the collection of the blood sample, and more likely than not that it was either the day before or maybe sometime prior to that." (Id., p.18–19).

---

**5.** The Court does not credit the testimony of Officer Simpkins attributing alcohol consumption and the presence of beer bottles to Hoosier. Simpkins' testimony might have been colored by his interest and familial relationship with the victims. The Officer's testimony was contradicted by the testimony of all other occurrence witnesses and the objective blood test results.

Based on the foregoing, the Court **FINDS** Butalbital and Codeine, drugs prescribed by Dr. Srichai, and not Valium, were the medications that combined to proximately cause Hoosier's impairment at the time of the accident.

### F. Expert Testimony on the Standard of Care

On the issue of whether Dr. Srichai's treatment of Terry Hoosier fell below the standard of care of a treating physician, Plaintiffs elicited the testimony of James Gregory Rosencrance, M.D.[6] Dr. Rosencrance testified to a reasonable degree of medical certainty that Dr. Srichai violated the standard of care by persistently prescribing addictive medications over a period of several years to a known drug and alcohol abuser.

Dr. Rosencrance further opined Dr. Srichai's failure to refer Hoosier for alcohol and drug rehabilitation prior to the accident and his failure to otherwise treat his patient for alcohol and prescription drug abuse, considering his awareness of Hoosier's long history of alcohol and prescription drug abuse/dependence, fell below the standard of care of a reasonably competent physician. Dr. Srichai should have ordered rehabilitation for Hoosier years earlier.

Dr. Rosencrance concluded that it was "poor medicine" for Dr. Srichai to continue to prescribe several addictive medications in combination over a long period. According to Dr. Rosencrance, given there was very little alcohol in Hoosier's blood following the accident and given that Bu-

talbital, Codeine and Valium were found in the bloodstream, it was very likely that these drugs, rather than simple fatigue, proximately caused Hoosier's impaired condition on the day of the accident, particularly in light of Hoosier's staggering demeanor and reckless driving a few hours before the accident, his erratic driving just prior to the accident and his bizarre behavior following the accident.

Dr. Rosencrance acknowledged that, over the years, Terry Hoosier suffered some medical conditions for which prescription pain medication may have been appropriate. However, Dr. Rosencrance testified, in his medical opinion, Soma, Klonopin and Esgic Plus in the dosages prescribed to Hoosier would be appropriate medications only for limited period of time, two to three weeks at most, for the treatment of acute, severe pain. He opined that such a medication regimen would be inappropriate treatment for chronic pain over a protracted period.

William Stroud Hitch, M.D.[7] testified for the United States. In his opinion, Dr. Srichai's treatment of Terry Hoosier "was pretty much within the standard of care." He opined that Hoosier was a difficult and demanding patient who needed some sort of Diazepam to keep him functioning. He also opined that Butalbital is a very weak barbituate, almost a placebo. Regarding Hoosier's claim that he ingested almost an entire bottle of cough syrup on the date of the fatal accident, Dr. Hitch did not believe it was possible.

In sum, Dr. Hitch postulated the combination of drugs ingested by Hoosier on the

---

**6.** Dr. Rosencrance is Board Certified in Internal Medicine and a faculty member of West Virginia University, Charleston Division, in the Department of Internal Medicine. He also maintains a private clinical practice in Charleston, West Virginia.

**7.** Dr. Hitch is Board Certified in Thoracic Surgery and is a Fellow in the College of Surgeons and the College of Emergency Physicians. For many years, however, he has engaged in family practice, specializing in industrial medicine, and he no longer performs surgery.

day of the accident had nothing whatsoever to do with its causation. He opined it was safe for Hoosier to take Klonopin, Soma, Esgic Plus and Phenergan with Codeine in combination and also operate a vehicle, despite *PDR* warnings to the contrary.[8]

8. The *PDR* contains the following details, among other information, concerning drugs prescribed by Dr. Srichai to Hoosier:

**Phenergan® with codeine** (Promethazine Hydrochloride and Codeine Phosphate):

. . . . .

Narcotic analgesics, including codeine, exert their primary effect on the central nervous system[.]

. . . .

**Promethazine**[:] Promethazine may cause marked drowsiness. Ambulatory patients should be cautioned against such activities as driving or operating dangerous machinery until it is known they do not become drowsy or dizzy from promethazine therapy. The sedative action of promethazine hydrochloride is additive to the sedative effects of central nervous system depressants; therefore, agents such as alcohol, narcotic analgesics, sedative, hypnotics, and tranquilizers should either be eliminated or given in reduced dosage in the presence of promethazine hydrochloride.

. . . . .

Phenergan with codeine is a Schedule V Controlled Substance.

**Abuse**[:] Codeine is known to be subject to abuse; however, the abuse potential of oral codeine appears to be quite low.... However, codeine must be administered only under close supervision to patients with a history of drug abuse or dependence.

**Dependence**—Psychological dependence, physical dependence, and tolerance are known to occur with codeine.

**Esgic–Plus**™ **(Butalbital, Acetaminophen and Caffeine Tablets) (\*Warning: May be habit forming)**

**Klonopin®** (Clonazepam):

**WARNINGS**

*Interference with Cognitive and Motor Performance:* Since Klonopin produces CNS depression, patients receiving this drug should be cautioned against engaging in hazardous occupations requiring mental alertness, such as operating machinery or driving a motor vehicle. They should also be warned about the concomitant use of alcohol or other CNS-depressant drugs during Klonopin therapy[.]

. . . . .

*Alcohol:* Patients should be advised to avoid alcohol while taking Klonopin.

. . . . .

*Pharmacodynamic Interactions:* The CNS-depressant action of the benzodiazepine class of drugs may be potentiated by alcohol, narcotics, [and] barbituates[.]

. . . .

**DRUG ABUSE AND DEPENDENCE**

*Controlled Substance Class:* Clonazepam is a Schedule IV controlled substance.

*Physical and Psychological Dependence:* ... Addiction-prone individuals (such as drug addicts or alcoholics) should be under careful surveillance when receiving clonazepam or other psychotropic agents because of the predisposition of such patients to habituation and dependence.

**SOMA®** (carisoprodol)

**Potentially Hazardous Tasks**—Patients should be warned that this drug may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks such as driving a motor vehicle or operating machinery.

**Additive Effects**—Since the effects of carisoprodol and alcohol or carisoprodol and other CNS depressants or psychotropic drugs may be additive, appropriate caution should be exercised with patients who take more than one of these agents simultaneously.

**Drug Dependence**—In dogs, no withdrawal symptoms occurred after abrupt cessation of carisoprodol from dosages as high as 1 gm/kg/day. In a study in man, abrupt cessation of 100 mg/kg/day (about five times the recommended daily adult dosage) was following in some subjects by mild withdrawal symptoms such as abdominal cramps, insomnia, chilliness, headache, and nausea. Delirium and convulsions did not occur. In clinical use, psychological dependence and abuse have been rare, and there have been no reports of significant abstinence signs. Nevertheless, the drug should be

Dr. Hitch opined alcohol and lack of sleep, rather than the prescription drugs, proximately caused the accident. In his opinion, Hoosier was "falling down drunk" by 2:45 p.m. with a blood alcohol content of 0.25. Dr. Hitch arrived at his opinion by rejecting the zero blood alcohol tests because, also in his opinion, those tests were inconsistent with Hoosier's historic alcohol abuse, Officer Simpkins testimony, and the eyewitness accounts of Hoosier's behavior on the day of the accident.

On cross examination, Dr. Hitch acknowledged he had testified for the United States as an expert witness in two cases previously. He also stated he had never medicated a patient over an extended period with the type and combination of drugs prescribed by Dr. Srichai to Hoosier. Nonetheless, he believed Dr. Srichai's course of treatment was appropriate and was one he possibly would use in the future. Finally, Dr. Hitch noted two physicians may have different opinions on the proper course of treatment and both opinions yet may be within the standard of care.

The Court credits the medical opinions expressed by Dr. Rosencrance and discredits, as unsupported and contradicted by other evidence, those expressed by Dr.

Hitch regarding whether Dr. Srichai's treatment of Hoosier fell within the standard of care. Accordingly, the Court **FINDS** and **CONCLUDES** Dr. Srichai's treatment of Terry Hoosier, in persistently prescribing addictive medications over a period of several years to a known drug and alcohol abuser, fell below the appropriate standard of medical care and treatment and was the proximate cause of the death, injuries and damages suffered by Plaintiffs.

Further, the Court rejects Dr. Hitch's opinion regarding the cause of Hoosier's impairment on the day of the accident. Hoosier clearly ingested some alcohol the day of the accident, i.e. the 32 ounce bottle of beer he purchased at the convenience store. It is clear also from the drug and alcohol blood test results, as well as the observations of numerous witnesses, who failed to detect any alcohol on Hoosier's breath, that Hoosier's severe impairment was not caused by alcohol, but by the lethal combination of medications knowingly prescribed by Dr. Srichai, the agent of the Defendant.

### G. Damages

Regarding special damages, the parties were able to stipulate to the following:

| | | | |
|---|---|---|---|
| Katie Hubbard's medical expenses | $ 140,818.15 | | |
| Lynn Hubbard's medical expenses | 87,845.33 | | |
| Funeral expenses for Sammy Hubbard | 7,955.03 | | |
| Katie's Life Care Plan Option I | 2,351,265.00 | Option II | 1,935,858.00 |
| The Decedent's lost earnings | 827,131.00 | | |
| The Decedent's lost household services | 75,167.00[9] | | |

used with caution in addiction-prone individuals.

. . . . .

*Central Nervous System*—Drowsiness and other CNS effect may require dosage reductions.

. . . . .

**OVERDOSAGE**
Overdosage of carisoprodol has produced stupor, coma, shock, respiratory depres-

sion, and very rarely, death. The effects of an overdosage of carisoprodol and alcohol or other CNS depressants or psychotropic agents can be additive even when one of the drugs has been taken in the usual recommended dosage.

9. The present value of the lost earning capacity and the lost household services of Sammy Hubbard, deceased, were calculated by Michael L. Brookshire, Ph.D. The stipulated

| TOTAL | $3,490.181.50 | $3,074,774.50 |
|-------|---------------|---------------|

*See* Stipulation on Special Damages, filed August 20, 2001.

As revealed above, Katie's Life Care Plan (the "Plan") is the most substantial portion of Plaintiffs' special damages. The Plan was prepared by Rehabilitation Consultant and Life Care Planner, Diana McCoy, MS, RN, CRRN, CCM, CLCP, FAAPM.[10] As Ms. McCoy testified, the Plan contains a detailed, comprehensive assessment of various medical and non-medical expenses necessary for Katie to reach optimal levels of function, independence and wellness and to prevent or minimize potential complications.

The Plan contains an Option I and an Option II. Ms. McCoy testified the essential difference between the two options was the cost of an elective surgery that could permit Katie to empty her bladder and bowel with the aid of an implanted electrical device and a colostomy bag attached from the outside. Option I details Katie's life needs and expenses assuming she does *not* have the elective surgery. Option II details her needs and expenses if she has the surgery. Katie's expenses under Option I ultimately will be greater over her lifetime, due to the cost of catheterization supplies and other expenses. Until Katie is skeletally mature, most likely at age 21, her physicians cannot assess whether she is a proper candidate for the procedure.

Regarding whether Katie will have the surgery assuming she proves to be a proper candidate, her mother testified, is a decision Katie will make on her own, considering the risk, desirability of the outcome and other factors. Because it remains speculative whether Katie will be able to physically tolerate the surgery and accommodate the device, the Plaintiffs expressed a strong preference for Option I.

Based upon the above stipulations and the testimony of Ms. McCoy and Lynn Hubbard, the Court **FINDS** Plaintiffs have proven special, economic damages in the amount of **$3,490,181.50**. In making this finding, the Court adopts the cost of Katie's Life Care Plan under Option I as most reasonable considering her current age and circumstances.

The parties did not stipulate to the amount of non-economic damages but Plaintiffs adduced testimony supporting such losses. As previously stated, Sammy Hubbard, husband and father of two, died of his crash injuries. James Lesher, Lynn Hubbard's brother, testified he knew Sammy Hubbard as long as Lynn had known Sammy. According to Lesher, Sammy was a loving husband and Lynn and Sammy were a great couple. He also testified that Sammy was devoted to his daughter, Katie, and his new 19 day-old son, Seth. Mr. Lesher recalled that Sammy was a very good provider to the family. For example, Sammy obtained employment in St. Albans and for an extended period

amount for lost earning capacity includes adjustments for work life expectancy, work force participation rates and employment rates. Adjustments for federal income taxes were also made. The present value of the lost household services was based on six hours of services per week valued in 1997 dollars at $6.76 per hour.

10. The United States initially retained Ms. McCoy as its life care expert, with the Plaintiffs having retained their own expert. However, after both experts reached similar conclusions, the parties elected to jointly rely on the Life Care Plan prepared by Ms. McCoy.

drove an hour and a half to work and return each day so he could provide for his family.

Plaintiffs also presented a videotape to illustrate the life the Hubbards shared before the accident. The video showed, among other things, Sammy Hubbard holding his new baby girl, Katie, at the hospital when she was born and a later party celebrating Katie's fifth birthday. The video also portrayed Katie performing a song and dance for her father while he encouraged her behind the video camera. Photographs submitted as part of the parties' Joint Exhibits amply and poignantly demonstrate a loving family, enjoying special times together.

A second videotape vividly portrayed the life Katie now lives in a wheelchair, while requiring constant care and assistance from her mother, Lynn. Katie has to wear various cumbersome support devices to aid in muscle and bone development and to inhibit atrophy and circulation complications. At least five times a day, Katie must be catheterized by her mother or grandmother. Her mother is called upon to perform digital manipulation on Katie every 2 to 3 days to stimulate and maintain bowel continence. Weekly physical therapy is also a part of Katie and Lynn's routine. Katie must also be monitored by a neurosurgeon, orthopod, urologist, psychologist/psychiatrist, and a pediatrician on a continuous basis. Katie's medical evaluations require monthly, and sometimes weekly, visits to hospitals and doctors' offices.

In addition to permanent paraplegia, Katie also suffered a lacerated liver, fractured pelvis, contusions of the upper breast, contusions of the spine, lacerations to the face and legs, cracked ribs and ancillary injuries.

The injuries incurred by Lynn Hubbard also were extremely serious and she remained comatose for the first five days following the accident. Her injuries included, but were not limited to, a broken C–2 vertebra in her neck, two broken femurs, head injuries, and head and arm lacerations.

As result of the death of Sammy Hubbard and the injuries inflicted on Katie and Lynn Hubbard, the Plaintiffs have suffered and will suffer the following non-economic damages: (1) past and future physical and emotional pain and suffering; (2) past and future loss of enjoyment of life; (3) sorrow, mental anguish and solace; (4) loss of companionship, comfort, guidance, kindly offices and advice of the decedent; and (5) loss of services, protective care and assistance provided by the decedent.

These losses easily exceed $1,000,000.00. However, because *West Virginia Code*, Chapter 55, Article 7B, Section Eight, as amended (§ 55–7B–8) limits non-economic losses in a medical negligence action to $1,000,000.00, Plaintiffs' recovery is limited accordingly. The Court **FINDS** and **CONCLUDES** Plaintiffs are entitled to an award on non-economic damages in the amount of $1,000,000.00 as reasonable compensation for pain and suffering and all those genuine losses detailed above.

## III. CONCLUSIONS OF LAW

### A. *Claims Under the Federal Tort Claims Act*

Plaintiffs exhausted all required administrative remedies prior to filing their Amended Complaint. *See* Joint Stipulation on Exhaustion of Administrative Remedies, filed July 24, 2001. Accordingly, jurisdiction in this Court is appropriate under 28 U.S.C. § 1346(b), which provides that the district courts shall have exclusive jurisdiction of civil actions against the

United States based on claims for personal injuries.

■ Whether a claim can be made against the United States under the FTCA depends upon whether a private individual under like circumstances would be liable under state law. *See, e.g., Bellomy v. United States*, 888 F.Supp. 760 (S.D.W.Va. 1995). Because the alleged negligence occurred in West Virginia, the Court applies state substantive law.

## B. Third–Party Claims Under the Medical Professional Liability Act

■ Defendant maintains West Virginia substantive law does not recognize a third-party claim against a physician arising out of the negligent treatment of a patient. In its Memorandum Opinion and Order entered May 3, 2001, this Court concluded the West Virginia Medical Professional Liability Act ("MPLA"), codified at *West Virginia Code § 55–7B–1 et seq.*, contemplates such an action. Under the MPLA, "medical professional liability" is defined as "any liability for damages resulting from death or injury of a *person* for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a *patient.*" W.Va.Code § 55–7B–2(d)(emphasis added.); *see also* W.Va.Code § 55–7B–1 (including in the Act's purpose "[t]hat our system of litigation is an essential component of this state's interest in providing adequate and reasonable compensation to those persons who suffer from injury or death as a result of professional negligence[.]").

The term "patient" is defined in *West Virginia Code § 55–7B–2(e)* as "a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." The word "person," utilized in §§ 55–7B–1 and 2(d), is not defined in the Act.

Under West Virginia's well-established rules of statutory construction, "person" must be given its common, ordinary and accepted meaning. *State v. Snodgrass*, 207 W.Va. 631, 535 S.E.2d 475, 2000 WL 966184 (2000) ("'Each word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning.'") (quoting *State ex rel. Cohen v. Manchin*, 175 W.Va. 525, 533, 336 S.E.2d 171, 180 (1984)). The common, ordinary and accepted meaning of "person" is "[a] human being." Webster's II New Riverside Dictionary 510 (1996). The Legislature carefully utilized "person" and "patient" as separate and distinct terms throughout the Act, and, more significantly, in the very same sentence in *West Virginia Code § 55–7B–2(d)* (defining "medical professional liability"). Thus, both words must be construed as having a "specific purpose and meaning." *Keatley v. Mercer County Bd. of Educ.*, 200 W.Va. 487, 490 S.E.2d 306, 314 (1997) ("It has been a traditional rule of statutory construction that 'the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning.'" (internal citation omitted) (emphasis added)).

The Legislature elected to provide a cause of action allowing the imposition of tort liability on health care providers for damages resulting from the death of or injuries to *"persons* ... based on health care services rendered ... to a *patient."* Plaintiffs are persons who may assert and enforce third-party negligence claims under the Act against those rendering health care services to Terry Hoosier, a patient. Because the highest court of West Virginia has not addressed this issue of first im-

pression, the Court will certify this portion of its ruling by separate order to the Supreme Court of Appeals of West Virginia, pursuant to the Uniform Certification of Questions of Law Act contained in Chapter 51, Article 1A of the *West Virginia Code.*[11]

### C. Plaintiffs' Claim Under the MPLA

■ To establish a legally cognizable medical malpractice claim under West Virginia law, Plaintiffs must prove:

(a) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(b) Such failure was a proximate cause of the injury or death.

W.Va.Code § 55–7B–3.

In *Bellomy v. United States,* 888 F.Supp. 760 (S.D.W.Va.1995), the undersigned discussed the applicable burdens and standards governing a medical negligence action under West Virginia law:

The plaintiff bears the burden of proving negligence and lack of skill on the part of the physician proximately caused the injuries suffered. See W.Va.Code §§ 55–7B–7 (1986) ("The applicable standard of care and a defendant's fail-

ure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff[.]").

Ordinarily, a claim of medical malpractice must be supported by expert testimony.[12]

To be admissible, the expert testimony supporting a plaintiff's medical malpractice claim need not be expressed in terms of reasonable certainty, but must be expressed at least in terms of reasonable probability.

The physician is not bound to provide the patient with the highest degree of care possible. The mere fact a patient is not cured by the physician's treatment does not establish or raise a presumption of negligence.

Where a physician does not specially contract to provide a higher degree of care, he or she "is required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average members of the profession in good standing ... and in the same general line of practice, regard being had to the state of medical science at the time[ ]" the cause of action accrued. Thus, "the controlling issue [in a medical malpractice trial] is whether [the physician] has exercised reasonable and ordinary care, skill and diligence,

---

**11.** It is the intent of the undersigned this Memorandum Opinion and Order shall be interlocutory only until the procedures allowable under these sections of the *West Virginia Code* are exhausted and a separate judgment order is entered in this forum.

**12.** *See* W.Va.Code §§ 55–7B–7[,as amended]: The applicable standard of care and a defendant's failure to meet said standard, if at issue, shall be established in medical professional liability cases by the plaintiff by one or more knowledgeable, competent expert witnesses if required by the court. Such expert testimony may only be admitted in evidence if the foundation, therefor,

is first laid by establishing that: (a) The opinion is actually held by the expert witness; (b) the opinion can be testified to with reasonable medical probability; (c) such expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (d) such expert maintains a current license to practice medicine in one of [the] states of the United States; and (e) such expert is engaged or qualified in the same or substantially similar medical field as the defendant health care provider.

such as accords with the usual standards of the profession as practiced by accredited [physicians.]"

Moreover, where there is more than one method of medical treatment accepted and applied by average physicians similarly situated, the physician may take into account the particular circumstances of each case and may exercise his honest and best judgment in selecting a course of treatment for individual patients. Thus, where more than one acceptable method of treatment is available, he need not choose the best one.

On the other hand, a physician has a duty to give a patient the care and attention required by the known exigencies of the patient's case. A physician is liable in tort when he or she makes a gross error[13] in judgment at odds with the degree of skill a physician is under a duty to possess.

A plaintiff in a negligence action has the burden of showing the injuries complained of were proximately caused by the negligence. The proximate cause of an injury has two dimensions: first, the injury resulting from the negligence must have been reasonably foreseeable to a prudent person; and second, the act or omission must have caused the injury.

For the plaintiff to prove his case, he need not show his injury resulted solely from the physician's negligence. The plaintiff's burden of proof in a medical malpractice case is satisfied when the plaintiff shows the physician's "acts or omissions increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff[.]"

*Bellomy,* 888 F.Supp. at 763–66 (citations omitted).

Here, the death of Plaintiffs' decedent, Sammy Hubbard, and the injuries to Plaintiffs Lynn and Katie Hubbard were proximately and foreseeably caused by the negligence of Dr. Srichai, the employee and agent of the Defendant. Dr. Srichai had treated Hoosier for seventeen years with a profound awareness that Hoosier was a binge drinker and that he would abuse any substance that gave him "a high." Hoosier presented himself to Dr. Srichai with a variety of problems, some real and some fabricated, and year after year, Dr. Srichai satisfied Hoosier's unwarranted requests for pain medication.

Dr. Srichai became sympathetic to Hoosier's complaints, partly because he and Hoosier developed a personal and social relationship, in addition to their professional relationship. Dr. Srichai satisfied Hoosier's demands for multiple prescriptions even after he observed Hoosier in an impaired state. Hoosier often returned early to seek additional prescriptions, claiming the ones already given were ineffective to alleviate pain and distress. Dr. Srichai clearly knew Hoosier was doubling up on his medications and otherwise not using the medications as prescribed.

■ The *Physician's Desk Reference* ("*PDR*"), a commonly accepted reference used by the medical profession and informed laity, warned of the addictive effects of those medications prescribed by Dr. Srichai and also warned the medications should not be given to individuals who suffered drug or alcohol addictions. Because of the potential drowsiness caused by these medications, the *PDR* also warned that patients should not drive or operate automobiles or motorized equip-

---

**13.** Although a plaintiff usually must present expert evidence to support even a prima facie claim of medical malpractice, there are situations where the physician's lack of care or skill is so great and gross that expert testimony is unnecessary.

ment while taking the medications. Despite these warnings, Dr. Srichai continued to prescribe these medications, in combination, to a known drug and alcohol abuser.

As Dr. Rosencrance opined, a physician exercising reasonable and ordinary care, with such skill and diligence so to accord with the usual standards of those practiced by accredited physicians, would not have continued to prescribe Soma, Klonopin, Esgic Plus and Phenergan with Codeine to Hoosier, a known drug and alcohol abuser. Dr. Srichai's repeated prescribing to the contrary fell below the standard of care.

Further, Srichai's negligence was a proximate cause of the accident. While under the influence of Dr. Srichai's addictive prescription medications, Hoosier was dangerous to himself and the public. Dr. Srichai clearly was aware Hoosier took his prescription medications in such dosages and in such a combination so as to severely impair his ability to function. It was foreseeable, therefore, to Dr. Srichai that Hoosier would do so again. It was foreseeable and known also that this known alcohol and drug abuser, who routinely disregarded warnings given by health care professionals, would operate a motor vehicle while impaired.

On the day of the accident, Hoosier was impaired by ingestion of medications negligently prescribed by Dr. Srichai. He was not impaired by alcohol, as Dr. Hitch contended, although it is probable Hoosier drank the 32 ounce bottle of beer he purchased the day of the accident.

Accordingly, Dr. Srichai's treatment of Hoosier, in continually and repeatedly prescribing addictive medications to him, was the proximate cause of the occurrence damaging Plaintiffs. Furthermore, a known drug and alcohol abuser's failure to conform to Dr. Srichai's directions not to consume alcohol or drive a vehicle while under the influence of the addictive medications cannot absolve Dr. Srichai of liability for his negligent treatment. Warnings given to a known alcoholic and drug addict not to abuse the drugs do not serve to immunize a physician from liability when the physician knows earlier warnings to the patient were ignored repeatedly over a period of almost two decades.

■ Finally, the Court declines to find the conduct of Parts America store employee Aaron Burgess, in failing to notify authorities of Hoosier's condition, to be an intervening cause which absolves Dr. Srichai of liability. It was Hoosier himself and Dr. Srichai's treatment of Hoosier that put the Hubbards in peril on July 20, 1997, not the inaction of a store employee who happened to serve Hoosier the day of the accident and note his bizarre behavior. Similarly, the Court also declines to find the conduct of Officer Matt Carter, in failing to arrest Hoosier when he pulled him over in the town of Man, to be an intervening cause. The Court did not hear testimony from Officer Carter and therefore, will not make a speculative finding on his conduct.

Based upon the foregoing findings of fact and conclusions of law, the Court assigns to the United States thirty-three percent (33)% of fault for the cause of Plaintiffs' damages and under *West Virginia Code* § 55–7B–9, the United States is jointly and severally liable for Plaintiffs' damages. Terry Hoosier's negligence was the other major cause of the Plaintiffs' damages [14] and therefore, the Court apportions to Hoosier the remaining sixty-seven percent (67%) of fault. Judgment will not be entered against Hoosier because the

---

14. Hoosier pled guilty to state charges of DUI Causing Death and is currently serving a one to ten year sentence at St. Marys Correctional Center in St. Marys, West Virginia.

parties agreed to dismiss him from the action prior to trial. *See* Agreed Order of Dismissal of Terry Hoosier entered April 5, 2001.

## IV. CONCLUSION

■■ Plaintiffs proved by a preponderance of the evidence that Dr. Srichai's treatment of Terry Hoosier fell below the standard of care and such treatment was a proximate cause of the death of Sammy Hubbard, as well as the permanent injuries to Lynn and Katie Hubbard. The Plaintiffs have also proven by a preponderance of the evidence they have and will suffer $3,490,181.50 in special/economic damages and $1,000,000.00 in general/noneconomic damages. Accordingly, the Court **FINDS** in favor of the Plaintiffs and against the United States and will award Plaintiffs total damages in the amount of $4,490,181.50.[15] The Court will schedule a separate summary proceeding to determine the portion of this judgment to be awarded to minors, Katie Hubbard and Seth Hubbard.

The Court directs the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and the United States Attorney.

15. Defendant moved to seek an offset of $40,-000—an amount paid Plaintiffs by Hoosier's auto liability insurer. Plaintiffs do not object to the offset. Final judgment, when entered by separate order, will be adjusted accordingly.