**People of State of Illinois, Defendant in Error, v. Samuel Guzzardo, Plaintiff in Error.**

**Gen. No. 10,812.**

Second District.

February 7, 1955.

Released for publication February 24, 1955.

Sam J. Cannariato, of Cannariato and Nicolosi, of Rockford, for plaintiff in error.

Robert R. Canfield, State's Attorney, William R. Nash, and Rosario A. Gaziano, Assistant State's Attorneys, all of Rockford, for defendant in error.

MR. JUSTICE CROW delivered the opinion of the court.

This is a proceeding to review the conviction of the defendant by the county court, without a jury, the defendant having waived trial by jury, under Count III of an information charging a violation of ch. 38, Ill. Rev. Stats. 1953, par. 507 [Jones Ill. Stats. Ann. 37.465], the defendant having been found guilty and the court having assessed the penalty at a $50 fine, and costs.

Chapter 38, Ill. Rev. Stats. 1953, par. 507, provides that:

"507. Unlawful assembly.] Sec. 252. If two or more persons assemble for the purpose of disturbing the public peace, or committing any unlawful act, and do not disperse on being desired or commanded so to do by a judge, justice of the peace, sheriff, coroner, constable or other public officer, the persons so offending shall be severally fined not exceeding $200."

Count III of the information, so far as material alleges that:

"And the said Robert R. Canfield in the name and by the authority of the People of the State of Illinois, further informs the Court that the said . . . Samuel Guzzardo . . . (and some 21 other named defendants) together with divers other persons whose names are to said affiant here unknown, on the 12th day of January, in the year of Our Lord one thousand nine hundred and fifty four, in the City of Rockford, in said County and State aforesaid, did unlawfully and riotously assemble and gather together for the purpose of doing an unlawful act, to-wit: for the purpose of seeking then and there to prevent other persons, to-wit: Ernest Wilke, Marvin Ferguson, and E. A. Bishop from working at a lawful business on terms that Ernest Wilke (et al.) then and there saw fit, by threats, intimidation, and unlawful interference, and the said . . . Samuel Guzzardo . . . (and the 21 other named defendants), together with divers other persons and each of them, being then and there so assembled and gathered together, then and there did not disperse on being then and there, while being so assembled and gathered together as aforesaid, desired and commanded so to do by one Clifford Hand then and there a police officer of the said City of Rockford . . ."

A motion of the defendant to quash the information was denied. The defendant made a motion to dismiss

at the close of the People's evidence, upon which ruling was at first reserved and later it was denied, and the defendant made a similar motion at the close of all the evidence and that was denied.

The defendant is an alderman of the City of Rockford and was such at the time of the alleged violation of the statute.

On this review the defendant's theories are: (1) As an alderman of the City of Rockford he is a "public officer," does not come within the meaning of "persons" as used in ch. 38, Ill. Rev. Stats. 1953, par. 507, and the statute is not applicable to him; (2) he was not proven guilty beyond a reasonable doubt and to a moral certainty; and (3) the evidence as to his prior good reputation was not given enough weight.

As to the defendant's first contention, he cites no statute or case authority to sustain the same and we, independently, have found none in Illinois. Assuming that an alderman is a "public officer" as those terms are used in ch. 38, Ill. Rev. Stats. 1953, par. 507, that individual is nonetheless also a "person" and comes within the meaning of "persons" as that term is used in that statute.

Webster's "New World Dictionary," p. 1092, defines "person," so far as material, in this manner:

"1. a human being, especially as distinguished from a thing or lower animal; individual man, woman, or child; . . . 3. (a) a living human body, . . . 6. in law, any individual or incorporated group having certain legal rights and responsibilities . . . ."

Bouvier's "Law Dictionary," p. 934, defines "person," so far as material, in this manner:

"A man considered according to the rank he holds in society, with all the right to which the place he holds entitles him, and the duties which it imposes . . . The term is, however, more extensive than man. It may include artificial beings, as corporations . . . Where

the statute prohibited any person from pursuing his usual vocation on the Lord's Day, it was held to apply to a judge holding Court: 49 Ga. 436 . . ."

■ "Person" is a generic word of comprehensive nature: Goddard et al. v. Chicago & N. W. Ry. Co. (1903), 202 Ill. 362; it certainly includes human beings; People v. Gould et al. (1932), 347 Ill. 298. It is not a technical term, or a word of art, and it has a simple, ordinary, common, popular meaning, unless such is inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute. We think that giving "persons," as used in paragraph 507, its simple, ordinary, common, popular meaning is not inconsistent with the manifest intent of the General Assembly or repugnant to the context of the statute.

Paragraph 507 of chapter 38 is section 252 of the original "An act to revise the law in relation to criminal jurisprudence," approved March 27, 1874, R. S. 1874, p. 348. It and paragraphs 503–511 [Ill. Rev. Stats. 1953, ch. 38, §§ 503–511; Jones Ill. Stats. Ann. 37.461–37.469] appear to have all come originally from the Act of March 27, 1874. Those paragraphs 503–511 and also paragraphs 512–535 [Ill. Rev. Stats. 1953, ch. 38, §§ 512–535; Jones Ill. Stats. Ann. 37.470–37.493] are all now classified in the revised statutes under the general heading of "Racing, Routs, Riots, Unlawful Assemblies, etc." Paragraphs 512–535 are not parts of the Act of March 27, 1874 but come originally from three other distinct statutes of later dates. Those latter, paragraphs 512–535, have nothing to do with the present case. The general heading of "Racing, Routs, Riots, Unlawful Assemblies, etc.," as applied to paragraphs 503–511, is in Hurd's Rev. Stats. of Ill., 1874, but whether such heading or classification is in the original Act of March 27, 1874 as adopted by the General Assembly, or is simply placed in the revised statutes as

360

published by the compiler or publisher, we do not know, but, as we see it, it doesn't make any difference anyway because we attach no particular significance thereto as a matter of statutory construction.

█ Paragraph 503 relates to "rout"; 504 relates to "riot"; 505 relates to "affray"; 506 relates to "unlawful assembly"; 507, involved here, relates also to "unlawful assembly"; 508 relates to "suppression"; 509 relates to "refusal to disperse"; 510 relates to "killing justified"; and 511 relates to "injuries to property." They do not all create or recognize criminal offenses, but paragraphs 503–508, and 511 do create or recognize criminal offenses. In all of those paragraphs the word "persons" is used. In none is "persons" specifically defined, or limited, or restricted. None of them provide that a "public officer," or, for that matter, a "judge, justice of the peace, sheriff, coroner, constable" or "municipal officer" or "magistrate" is not also a "person" for the purposes of the statute. In one, paragraph 507, here involved, reference is made to the desire or command to disperse by a "judge, justice of the peace, sheriff, coroner, constable, or other public officer." In others, paragraphs 508, 509, and 510, various duties are imposed on "the municipal officers, constables and justices of the peace thereof, and of the sheriff of the County and his deputies" to act under certain circumstances, or the officers and parties acting with them are purportedly relieved of liability for killing or wounding parties under certain circumstances, or liability is purportedly imposed for killing or wounding the officers and parties acting with them, under certain circumstances, or liability is purportedly imposed for property damages or personal injuries. In one, and only one, of the paragraphs, 508, is a criminal liability created or recognized as to the officers themselves, as such, and that paragraph provides that "each such officer having notice of

361

such unlawful assembly, and refusing or neglecting to do his duty in relation thereto, as aforesaid, shall be fined not exceeding $200.00." That a particular individual who is a "person" under paragraph 507 may also be a "public officer" and may be subject to possible prosecution under paragraph 508 (which question is not before us) does not relieve him from prosecution under paragraph 507.

Assuming that an alderman is a "public officer" as those terms are used in paragraph 507, and thus has the authority to indicate a desire or give a command to disperse to an unlawful assembly as therein stated, and thus also has the duties and responsibilities as stated in paragraph 508, and thus has also the purported statutory exemption from certain liabilities under certain circumstances as stated in paragraph 509, we perceive nothing in that circumstance, or in the general statutory heading or classification of "Racing, Routs, Riots, Unlawful Assemblies, etc.," or from a consideration of all the associated paragraphs together, paragraphs 503–511, to indicate that such an individual is not also at the same time a "person," as that term is used in paragraph 507 and subject to the same possible criminal liability thereunder that any other "person" is. Paragraph 507 does not except or exempt an alderman or other "public officer"; paragraphs 503–511, considered collectively, do not so except or exempt such a party; and we know of no other statutory or constitutional provision that so excepts or exempts such a party.

The simple, ordinary, common, popular meaning of words, dictionary definitions, such Illinois cases as there are, and principles of statutory construction make it clear to us that "persons" as used in paragraph 507 includes the defendant, even though he be also an alderman and hence a "public officer," if he is, and that the statute is applicable to him.

362

As to the defendant's second contention, 12 witnesses testified for the People, 10 witnesses, including the defendant, testified for the defendant, and the evidence covers some 192 pages of the report of proceedings. The gist of the offense alleged is, briefly, that the defendant (and 21 other defendants), together with other unknown parties, on January 12, 1954, in Rockford, unlawfully assembled for the purpose of doing an unlawful act, namely, seeking to prevent certain other named persons from working at a lawful business on terms those persons saw fit, by threats, intimidation, and unlawful interference, and that the defendant (and the 21 other defendants), together with the unknown parties, did not disperse on being desired and commanded so to do by Clifford Hand, a police officer of Rockford. We think the evidence abundantly sustains the verdict and judgment of conviction.

For some time prior to January 12, 1954, a strike had been in progress at the Quaker Oats Company's plant at Rockford by certain of the employees, members of a local C. I. O. union. Evidently not all of the employees of the plant were members of the union, and at least not all of the employees were on strike. Prior to January 12th, the union had apparently had some pickets stationed at the only gate or entrance to the plant, probably not a large number of pickets, and evidently one city police officer had also been stationed there on a 24-hour basis (several officers on different shifts).

The defendant, in addition to being an alderman of Rockford, was also, at the same time and on January 12th, an employee of the Illinois State Industrial Union Council, a C. I. O. labor union organization, in charge of its health and welfare services in downstate Illinois. One Emmett C. Poyer was the international representative of the united auto workers, C. I. O.; he "serviced" the local C. I. O. union at the Quaker Oats plant; and

363

he represented the union and its members in certain grievance procedures involving the company, members of the union, and the union. The defendant and Mr. Poyer were well acquainted. The defendant kept "some things," apparently files, papers, or documents of some kind in connection with his union duties, at Mr. Poyer's C. I. O. office in Rockford. A few days before January 12th, the defendant had been there, met Mr. Poyer, they went out, had some coffee, and discussed the "situation" at the Quaker Oats plant, Mr. Poyer telling the defendant what was going on at the strike. The defendant had just returned from the plant, and he, of course, knew there was a strike on. The defendant says Mr. Poyer explained to him the nature of a so-called alleged "agreement" between the union and the mayor and the chief of police, having something to do with the conduct of the strike, and supposedly limiting the number of pickets and the number of police to be stationed at the gate to the plant. Mr. Poyer complained that the alleged "agreement" had been "violated" by the police. The defendant says he paid no attention to that complaint. The defendant says that on January 11th, the day before the incidents here concerned, he received a message that Mr. Poyer wanted to see him again and they again met at Mr. Poyer's C. I. O. office in Rockford, conferred at length, Mr. Poyer claimed the police were "violating the agreement," said they were assisting people in and out of the gate in "violation" of the "agreement," and asked the defendant to bring the matter to the attention of the city council and make a "protest." The defendant says he said he'd go see for himself. Eric Anderson, a witness for defendant, is also an alderman, and he also works for the C. I. O., and he says the defendant on the evening of January 11th, discussed with him and certain other aldermen the matter of going out to the plant the next day to see what was going on at the strike. The defend-

ant says that Alderman Anderson did not get to the plant the next day, but that two other aldermen, Vestal, who is not a member of the C. I. O., and Melin, who we gather is an officer of the C. I. O. (the record being not entirely clear as to that), were there. Those two, Vestal and Melin, though there on the 12th, did not testify at the trial either for the People or the defendant.

The witnesses for the People were nine police officers of Rockford, the night watchman at the Quaker Oats plant, and two of the three employees named as having been unlawfully prevented from working, all of whom were present at the plant the morning of January 12th, when the incidents occurred. The witnesses for the defendant were the defendant himself, four character witnesses, Mr. Poyer (previously referred to, and of whom, curiously, defendant did not ask any questions concerning the incidents at the plant on January 12th), the mayor of Rockford (to part of whose alleged testimony an objection was sustained which is not now questioned, and who was also a character witness), Alderman Anderson (previously referred to), a party who was present as a picket (and whose comment that he saw no commotion at the gate taxes credulity in view of the record), and a court reporter who took down some conversation at a city council meeting a few days after the incidents here involved, covering a matter with which the defendant is not here charged and which is irrelevant.

One of the police officers, Edmund Pearce, who had the night shift from 10:00 p. m. January 11th to 5:45 a. m. January 12th, and who, at the outset, was the only officer present, says that before 6:00 a. m. January 12th, a string of cars approached the plant; men got out; they picked up a big railroad tie or ties and blocked the gate at the front entrance; the defendant was not there then; the officer tried to pick up the ties,

was rushed by some of the crowd against a steel post in the entrance, fell, the crowd stepped back, and he later got up; he radioed for more police help; 25–50 people were then standing in a circle in front of the gate, none could get in or out, and more people kept coming; additional police came, including a sergeant, and later a captain, the police tried to push the crowd back but could not move them; by 7:00 a. m. 50–75 men were in the crowd in the center in front of the gate preventing the police going through; the defendant arrived a few minutes after 6:00 a. m., shortly after the officer had been hurt, and defendant was there until later arrested and taken away, he was in the crowd right in front of the gate; the sergeant asked defendant to break the crowd, to leave, scram, take off, and defendant folded his arms and said we (the officers) had other things to do downtown without being out there, and he was no alderman today but was a picket and to class him as a picket; cars started to arrive with workers to get in the plant, some of the crowd rushed to stop the cars, rocking them, hollering and screaming, within the hearing of defendant; some of the crowd started a fire in the center of the gate or entrance a few feet out from the gate, it was cold; the captain's orders were to push the crowd from the gate; the police pushed, the crowd pushed; finally, the officers helped several cars through the gate; the officer's bosses told the defendant to disperse.

The night watchman, Raymond Lacey, says there were more than 100 people in front of the gate, they refused to let anyone in the plant; the defendant was there about 6:00 a. m., was in the crowd, he and others talked about not letting anybody in, that nobody was going to enter the plant; he and Poyer were together; some of the crowd shouted about turning cars over, the defendant being at the side of the crowd, some started to tip cars over but the police protected the occupants;

366

during the melee the defendant struggled and scuffled with a police officer, was arrested; Poyer had previously been to the plant every day giving orders to the strikers.

One of the employees, Marvin Ferguson, named as having been unlawfully prevented from working says he arrived at the plant in his car about 6:20 a. m.; was in a line of some 15–20 cars; there was a lot of commotion, some 75–80 people were in a group at the gate; they stopped him and the other cars, would not let them in; there was a fire in front of the gate; Poyer, Troy Venable (a witness for defendant) and others came to his car, he was about 50 feet from the gate, they walked up and down through the cars, cussing; the gateway was blocked; ultimately he was able to get in after about an hour.

Another of the employees, E. A. Bishop, named as having been unlawfully prevented from working says he went to the plant shortly after 6:00 a. m. to work, he was stopped about six feet from the gate by a log tie obstruction across the gate, pickets were there, they barred him from going in and shook his car; he backed up, drove around, and returned to the plant; the defendant then came up to his car (though he did not know it was the defendant at the time), conversed with him, shouting, emphatically, and told him to get out and get out quick because he was not going in and nobody else was going in that day; some other people, not defendant, were rocking the witness' car while defendant was talking with him; defendant went to another car, it backed up, the witness again backed, circled, and came back again about 6:30 or so; after another half hour or so he got in the plant.

Another of the police officers, Richard McLee, says the sergeant ordered the pickets around the gate to disperse; defendant was in front of the group, right by the sergeant; defendant said he was not there as an

367

alderman, but was one of the rest and expected to be treated as such; the sergeant ordered them to move from the gate, they didn't, they jeered and scattered remarks; about 100 people were around the gate; the police pushed, defendant hung on to this officer, having both arms around the officer's right arm; later Captain Hand came, he ordered the pickets to move away from the gate, to disperse, that all who were blocking the gate were in violation; he got the same response the sergeant had; the captain ordered the officers to arrest anyone who refused to move, the witness made four arrests, after the arrests the crowd cleared enough for cars to get past.

Another police officer, Edmund Moon, says the defendant stood in front of the picket line, three or four feet from the officer; defendant said "don't classify me as anything else today, I am one of the men"; the pickets were directly in front, blocking the gate, refusing passage to cars; some pickets went along the line of cars, knocking doors, and kicking them.

Another officer, Marvin Brett, says the defendant asked what we (the police) were doing there, that we had no business spending the taxpayer's money, and he was going to find out about it; police stopped the crowd from rocking a car; police tried to open the gate two times.

Another officer, Joseph Nigliazzo, says the defendant told the sergeant he (the sergeant) had no business there and to get out; defendant grabbed a policeman's arm and tugged.

The sergeant police officer, Carl Hartje, says he told Poyer, within defendant's hearing, that we (the police) were to open the gate because people wanted to go to work; defendant said he did not believe cops were hired to break strikes, to forget he was an alderman, he was just one of the boys; no one moved, they hollered, the defendant and Poyer were in front of the pickets,

368

about 100, and there were about 20 policemen; the police tried to push through and could not; the police moved a large log from in front of the gate, they tried to move a barrel which had the fire in it; Captain Hand arrived, talked directly to Poyer and the group, defendant being right behind Poyer, and told them they would have to move because we had to open the gate; he spoke loudly; no one moved; the captain again told them they would have to move; no one moved; the officers then began making arrests, including the defendant.

The captain police officer, Clifford Hand, said the defendant was within a few feet of Poyer, in the center of the crowd, when the captain loudly said he wanted Poyer to get the crowd out of the gate, there was more conversation, the captain told Poyer he was getting dangerously close to inciting a riot and he wanted him to get out of the gate; Poyer stepped out, turned to the crowd, told them to stand pat, don't move; the captain told them to clear the gate, they stood defiant and refused to move; shortly the captain told the police to arrest all who resisted; defendant was arrested about then; he and a police officer came tumbling out of the middle of the crowd.

Another officer, Charles Berve, says defendant was in the group of pickets who were ordered to disperse.

Another officer, Howard Fitzgerald, says defendant was about six feet away, in the middle of the crowd, when the captain was talking; defendant was asked to disperse, to help disperse the crowd, the men should be let through; no one complied with the captain's order.

The defendant admits he was at the gate to the plant about 6:10 a. m.; says there was a fire in a steel barrel in front of the gate, some timbers blocked the gate, no one could drive through, several cars were parked on the side of the road, he stood around and talked; more police came, he asked them why, told one they were taking sides against labor; he asked the sergeant if the

369

police were not leading to trouble with all the police and all the pickets there; he told the captain the crowd is getting a little out of hand, this is going to lead to bloodshed, and the police were inviting trouble having all the policemen there; the captain told him his orders were to keep the gate open; the sergeant did not tell him personally to disperse; he denies saying he was to be treated as a picket; no officer asked him to disperse or aid in dispersing the crowd; he did not ask the pickets to leave; he told the police he did not think they (the police) should be there, "this is going to create a riot," he asked the officers to leave and go away, he told them it was foolish to try and open the gate; there were 75–100 people; he saw the file of cars there, he assumed the people in them wanted to enter and go to work; he denies addressing anyone in a car; denies saying nobody is going in here today; he did not think the police should try to get the people out of the way; he was in front of the assembled group when the police tried to push through, after the captain had told him the group had to move and the police intended to keep the gate open and get the workers in; it was obvious the police were trying to move the group and open the gate; the fire in the barrel had to be moved to open the gate, the fire should not have been there, he asked no one to move it, he felt it was not his job; he denies telling the people to stay in front of the gate; he knew the police were to move the crowd and open the gate but he did not think that was the thing to do.

 The weight and sufficiency of all the evidence for the people and the defendant and the credibility of all the witnesses was, under the circumstances here, within the province of the trial judge, the trial judge having the opportunity of observing the conduct and demeanor of the witnesses while testifying, and unless a court of review is convinced the verdict and judgment is contrary to the weight of the evidence, and we are

370

not so convinced here, it is not within our sphere to set the verdict and judgment aside on that basis; upon controverted questions of fact we are reluctant to substitute our opinion for that of the trial judge, or jury, and will not do so unless it clearly appears the verdict and judgment is the result of passion or prejudice or is contrary to the weight of the evidence, and it does not so clearly appear here, or unless the record leaves us with a grave and substantial doubt of the guilt of the defendant, which it does not here; it is not the purpose of a reviewing court to determine whether the record is perfect, but to determine whether the defendant has had a fair trial under the law, whether the conviction is based upon competent evidence establishing guilt beyond a reasonable doubt, and whether there was any such error as might be prejudicial to the defendant's rights: People v. Manfucci et al. (1934), 359 Ill. 69; People v. Snyder (1917), 279 Ill. 435; People v. Arnett (1951), 408 Ill. 164; People v. Viti (1951), 408 Ill. 206; People v. Scott (1948), 401 Ill. 80; People v. Nowicki (1928), 330 Ill. 381; People v. Rejno (1949), 402 Ill. 84, and others.

As to the defendant's third and last contention, the evidence is that prior to January 12th, 1954, the defendant's reputation for being a truthful, law-abiding, and peaceful citizen was good, and the People stipulated his reputation as a law-abiding and peaceful citizen was good prior to that date. Good character and reputation evidence, where such is in issue, is, of course, entirely proper and permissible to be considered as a part of the defendant's case, along with all the other evidence in the case, though it is not a defense, as such, to a crime; it may, in a particular case, be sufficient to raise a reasonable doubt as to guilt; its sufficiency and weight, like that of all other evidence, however, is a question of fact for determination by the trier of the facts; if guilt is clearly established,

371

good character or reputation avails nothing; People v. Munday (1917), 280 Ill. 32; People v. Hrdlicka et al. (1931), 344 Ill. 211; People v. Klemann (1943), 383 Ill. 236; People v. Cozzie (1947), 397 Ill. 620; People v. Bridgewater (1938), 369 Ill. 633. There is nothing in the record here to indicate the trial court was not familiar with those principles, nor is there anything in the record to show that that court did not take into consideration the prior good character and reputation of the defendant in reaching its verdict and judgment: People v. Bridgewater, supra. The weight to be attached thereto, as well as the weight of all other evidence, under the circumstances, is for that court.

The judgment will be affirmed.

Affirmed.