567 S.E.2d 677

**Gorman Dale OSBORNE, et al., Plaintiffs,**

v.

**The UNITED STATES of America, et al., Defendants.**

No. 30115.

Supreme Court of Appeals of West Virginia.

Submitted March 12, 2002.

Decided July 3, 2002.

Dissenting Opinion of Justice Maynard, July 8, 2002.

Sean P. McGinley, Rudolph L. DiTrapano, J. Timothy DiPiero, Mary Sadd Blaydes, DiTrapano, Barrett & DiPiero, PLLC, Charleston, West Virginia, for plaintiffs.

Kasey Warner, United States Attorney, Stephen M. Horn, Assistant United States Attorney, United States Attorney's Office, Charleston, West Virginia, for defendants.

Michele Grinberg, C. Benjamin Salango, Flaherty, Sensabaugh & Bonasso, P.L.L.C., Charleston, West Virginia, for Amicus Curiae, West Virginia State Medical Association.

DAVIS, Chief Justice.

This case comes before us upon certification from the United States District Court for the Southern District of West Virginia. By order entered September 20, 2001,[1] the district court presents the following certified question: "Does West Virginia's Medical Professional Liability Act provide a cause of action by a third party against a health care provider for foreseeable injuries to the third party proximately caused by the health care provider's negligent treatment of a patient/tortfeasor?" Upon a review of the record presented for appellate consideration, the parties' arguments, and the pertinent authorities, we answer the certified question in the affirmative. We conclude that the West Virginia Medical Professional Liability Act [hereinafter referred to as the "MPLA"], W.Va.Code § 55–7B–1, et seq., does permit a third party to bring a cause of action against a health care provider for foreseeable injuries that were proximately caused by the health care provider's negligent treatment of a tortfeasor patient. However, in order to maintain such a third party action under the MPLA, the plaintiff must establish the elements of proof contained in W.Va.Code § 55–7B–3 (1986) (Repl.Vol.2000).

## I.

### FACTUAL AND PROCEDURAL HISTORY

Upon certification to this Court, the district court has ascertained the following facts.[2] On July 20, 1997, the plaintiffs herein were permanently and fatally injured when the vehicle in which they were riding was struck by a vehicle driven by defendant Terry Hoosier [hereinafter referred to as "Mr. Hoosier"]. Sammy Hubbard died as a result of his injuries; his wife, Lynn Hubbard, sustained serious injuries and was comatose for five days following the accident; their five-year-old daughter, Katie Hubbard, was rendered paralyzed from the waist down; and their nineteen-day-old son, Seth Hubbard, was not harmed. Blood alcohol tests following the accident showed that Mr. Hoosier had trace amounts of alcohol in his system, while blood testing for medications revealed the presence of Butalbital, Codeine, and Valium. It is presumed that the Butalbital and Codeine are attributable to prescription medications prescribed by Mr. Hoosier's longtime physician, Dr. Prakob Srichai [hereinafter referred to as "Dr. Srichai"].[3]

Dr. Srichai and Mr. Hoosier have had a physician-patient relationship since approximately 1980. The district court found that, during the seventeen year period immediately preceding the accident, Dr. Srichai had prescribed numerous medications for Mr. Hoosier, including several controlled substances for the management of pain, but that Dr. Srichai did not always verify that such medications were medically necessary. For example, various injuries with which Mr. Hoosier presented to the local emergency room were inconsistent with the range of motion he reported to Dr. Srichai during office visits, and which physical limitations Dr. Srichai found to exist. Moreover, following Mr. Hoosier's release from incarceration in October, 1995,[4] during which he had been

---

**1.** For the published version of this order, see *Osborne v. United States*, 166 F.Supp.2d 500 (S.D.W.Va.2001).

**2.** Pursuant to the Uniform Certification of Questions of Law Act, W.Va.Code § 51–1A–1, *et seq.*, a certified question must be accompanied by a statement of the facts upon which it is based. Absent an agreement of the parties as to the pertinent facts, the district court crafted its own statement of the facts underlying the instant proceeding. *See* W.Va.Code § 51–1A–6(a)(2), (b) (1996) (Repl.Vol.2000) (requiring order of certification to include "[t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose" and directing, "[i]f the parties cannot agree upon a statement of facts, then the certifying court shall

determine the relevant facts and shall state them as a part of its certification order"). For purposes of our determination of the question of law certified to this Court, we will recite only those facts pertinent to the instant query. A full recitation of the facts found by the district court may be found in its August 23, 2001, order. *See Osborne v. United States*, 166 F.Supp.2d 479 (S.D.W.Va.2001) (mem.).

**3.** The district court found that Dr. Srichai had given Mr. Hoosier prescriptions for Esgic Plus, a pain medication which contains Butalbital, and a cough medicine, Phenergan with Codeine.

**4.** Mr. Hoosier was incarcerated for a period of eight months after he had violated the conditions of his supervised release. Such supervision had

weaned from all medications, he presented to Dr. Srichai's office. At this visit, seven days after his release, Mr. Hoosier reported that he needed prescriptions for nine different medications that he had been taking while in jail, several of which were controlled pain management substances; it does not appear, however, that Dr. Srichai validated that such medications were necessary for the maintenance of Mr. Hoosier's health.

As a result of the injuries they sustained in the accident with Mr. Hoosier, the plaintiffs [5] filed suit in the Circuit Court of Logan County against Dr. Srichai and his employer, Community Health Foundation of Man, Inc. [hereinafter referred to as "CHF"], alleging medical professional liability resulting from the negligent prescription of controlled substances to a patient with a known prescription drug dependency. Mr. Hoosier was also named as a party defendant. On September 9, 1999, the action was removed to the United States District Court for the Southern District of West Virginia due to CHF's status as a federally funded program under the United States Department of Health and Human Services, and the exclusive jurisdiction of federal courts over claims brought under the Federal Tort Claims Act.[6]

Thereafter, Dr. Srichai and CHF moved to substitute the United States as the party defendant based upon CHF's position as an agent of the United States and Dr. Srichai's status as an employee thereof acting within the scope of his employment. In conjunction with the United States' substitution as the defendant to this proceeding, Dr. Srichai and CHF were dismissed from this action.

Following various arguments by both parties regarding the justiciability of a third party cause of action under the West Virginia Medical Professional Liability Act, the district court, by order entered May 3, 2001, denied the United States' motion for summary judgment and preliminarily found that the MPLA permitted the plaintiffs' claims. Upon a bench trial, the district court con-

cluded, by order entered August 23, 2001, that the plaintiffs had satisfactorily proven their entitlement to relief under the MPLA for injuries occasioned by Dr. Srichai's negligent treatment of Mr. Hoosier. Thereafter, by order entered September 20, 2001, the district court certified the above-quoted question of law to this Court, requesting this Court to determine whether a third party cause of action is permitted by the MPLA.

## II.

### STANDARD OF REVIEW

■ When this Court is called upon to resolve a certified question, we employ a plenary review. " 'A de novo standard is applied by this [C]ourt in addressing the legal issues presented by a certified question from a federal district or appellate court.' Syl. Pt. 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998)." Syl. pt. 2, *Aikens v. Debow*, 208 W.Va. 486, 541 S.E.2d 576 (2000). *Accord* Syl. pt. 1, *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court.").

■ The particular question that has been certified for our determination in the case *sub judice* requires us to interpret the provisions of the Medical Professional Liability Act. As such, we also accord a plenary review to this statutory inquiry. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). *Accord State v. Paynter*, 206 W.Va. 521, 526, 526 S.E.2d 43, 48 (1999) ("To the extent that we are asked to interpret a statute or address a question of law, our review is *de novo*."); Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195

---

been imposed in conjunction with Mr. Hoosier's sentencing for his cocaine distribution conviction.

Osborne, who is the administrator of Sammy Hubbard's estate.

**5.** In the style of the case presently before this Court, the named party plaintiff is Gorman Dale

**6.** *See generally* 42 U.S.C. § 233 (2000).

W.Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."). With these standards in mind, we proceed to consider the parties' arguments.

## III.

### DISCUSSION

In the case presently before us, we are asked to answer the following question of law certified by the United States District Court for the Southern District of West Virginia: "Does West Virginia's Medical Professional Liability Act provide a cause of action by a third party against a health care provider for foreseeable injuries to the third party proximately caused by the health care provider's negligent treatment of a patient/tortfeasor?" The district court answered this question in the affirmative, finding that the Hubbards'

7. At this juncture, we wish to acknowledge the appearance of the West Virginia State Medical Association as Amicus Curiae in this proceeding. We appreciate the Medical Association's participation in this case, and we will consider its contributions in conjunction with the defendants' arguments.

8. In its entirety, W.Va.Code § 55–7B–1 (1986) (Repl.Vol.2000) provides:

The Legislature hereby finds and declares that the citizens of this state are entitled to the best medical care and facilities available and that health care providers offer an essential and basic service which requires that the public policy of this state encourage and facilitate the provision of such service to our citizens:

That as in every human endeavor the possibility of injury or death from negligent conduct commands that protection of the public served by health care providers be recognized as an important state interest;

That our system of litigation is an essential component of this state's interest in providing adequate and reasonable compensation to those persons who suffer from injury or death as a result of professional negligence;

That liability insurance is a key part of our system of litigation, affording compensation to the injured while fulfilling the need and fairness of spreading the cost of the risks of injury;

That a further important component of these protections is the capacity and willingness of health care providers to monitor and effectively control their professional competency, so as to protect the public and ensure to the extent possible the highest quality of care;

cause of action against the defendants was proper in this case. Before this Court, the Hubbards maintain that the district court's conclusion is correct, while the defendants[7] argue that the governing statutes do not support the maintenance of the plaintiffs' claims.

As the matter presented for our determination concerns a question of statutory construction, we must first examine the statutory provisions upon which the plaintiffs base their right of recovery. W.Va.Code § 55–7B–1 (1986) (Repl.Vol.2000) sets forth the purpose of the Medical Professional Liability Act [MPLA], in part,[8] as recognizing:

That as in every human endeavor the possibility of injury or death from negligent conduct commands that protection of the public served by health care providers be recognized as an important state interest;

That it is the duty and responsibility of the Legislature to balance the rights of our individual citizens to adequate and reasonable compensation with the broad public interest in the provision of services by qualified health care providers who can themselves obtain the protection of reasonably priced and extensive liability coverage;

That in recent years, the cost of insurance coverage has risen dramatically while the nature and extent of coverage has diminished, leaving the health care providers and the injured without the full benefit of professional liability insurance coverage;

That many of the factors and reasons contributing to the increased cost and diminished availability of professional liability insurance arise from the historic inability of this state to effectively and fairly regulate the insurance industry so as to guarantee our citizens that rates are appropriate, that purchasers of insurance coverage are not treated arbitrarily, and that rates reflect the competency and experience of the insured health care providers.

Therefore, the purpose of this enactment is to provide for a comprehensive resolution of the matters and factors which the Legislature finds must be addressed to accomplish the goals set forth above. In so doing, the Legislature has determined that reforms in the common law and statutory rights of our citizens to compensation for injury and death, in the regulation of rate making and other practices by the liability insurance industry, and in the authority of medical licensing boards to effectively regulate and discipline the health care providers under such board must be enacted together as necessary and mutual ingredients of the appropriate legislative response.

That our system of litigation is an essential component of this state's interest in providing adequate and reasonable compensation to those persons who suffer from injury or death as a result of professional negligence;

. . . .

Therefore, the purpose of this enactment is to provide for a comprehensive resolution of the matters and factors which the Legislature finds must be addressed to accomplish the goals set forth above. In so doing, the Legislature has determined that reforms in the common law and statutory rights of our citizens to compensation for injury and death . . . must be enacted together as necessary and mutual ingredients of the appropriate legislative response.

In recognizing the need for greater reparation of injuries occasioned by medical negligence, the Legislature further clarified the term " '[m]edical professional liability' " to "mean[ ] any liability for damages resulting from the death or injury of a person for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a patient." W.Va.Code § 55–7B–2(d) (1986) (Repl.Vol.2000). It is this definitional language differentiating between "a person" and "a patient" upon which the district court based its finding of a third party right of recovery. Our task, then, is to decide whether the above-quoted statutory language permits such a cause of action.

■■■ "The primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. pt. 1, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975). To determine this legislative intent, we generally look to the precise language employed by · the Legislature. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968). *Accord* Syl. pt. 1, *State v. Jarvis,* 199 W.Va. 635, 487 S.E.2d 293 (1997) (" 'A statutory provision which is clear and unambiguous and plainly expresses the legislative in-

tent will not be interpreted by the courts but will be given full force and effect.' Syl. Pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951)."). *See also West Virginia Human Rights Comm'n v. Garretson,* 196 W.Va. 118, 123, 468 S.E.2d 733, 738 (1996) ("A statute is interpreted on the plain meaning of its provision in the statutory context, informed when necessary by the policy that the statute was designed to serve." (footnote and citation omitted)).

Upon reading the definition of "medical professional liability" contained in W.Va. Code § 55–7B–2(d), we are not left with the impression that its terms are ambiguous, confusing, or capable of more than one interpretation. Simply stated, this provision recognizes a health care provider's legal responsibility for damages, in tort or in contract, to a person who has sustained injuries or death as a result of such provider's provision of, or failure to provide, health care services to a patient. Despite the general clarity of this provision, however, the Legislature's use of the distinct terms "person" and "patient" gives us pause as only one of these words is defined in the MPLA's definitional section. *See* W.Va.Code § 55–7B–2(e) (1986) (Repl. Vol.2000) (defining "patient"). Therefore, we must ascertain whether the words "person" and "patient" employed in the definition of "medical professional liability" refer to separate individuals or whether these terms are synonymous. *See Sizemore v. State Farm Gen. Ins. Co.,* 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) (" 'A statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or *of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning.*' " (quoting *Hereford v. Meek,* 132 W.Va. 373, 386, 52 S.E.2d 740, 747 (1949)) (emphasis added)).

■■ In defining the concept of "medical professional liability," the Legislature employed both the word "person" and the term "patient": "any liability for damages resulting from the death or injury of a *person* for any tort or breach of contract based on health care services rendered, or which

should have been rendered, by a health care provider or health care facility to a *patient.*" W.Va.Code § 55–7B–2(d) (emphasis added). Ordinarily, when we construe a statute, we give effect to each word employed in a legislative enactment. "It has been a traditional rule of statutory construction that 'the Legislature is presumed to intend that every word used in a statute has a specific purpose and meaning[.]'" *Keatley v. Mercer County Bd. of Educ.*, 200 W.Va. 487, 495, 490 S.E.2d 306, 314 (1997) (quoting *State ex rel. Johnson v. Robinson*, 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979)). In other words,

> [i]t is presumed the legislature had a purpose in the use of every word, phrase and clause found in a statute and intended the terms so used to be effective, wherefore an interpretation of a statute which gives a word, phrase or clause thereof no function to perform, or makes it, in effect, a mere repetition of another word, phrase or clause thereof, must be rejected as being unsound, if it be possible so to construe the statute as a whole, as to make all of its parts operative and effective.

Syl. pt. 7, *Ex parte Watson,* 82 W.Va. 201, 95 S.E. 648 (1918). *Accord Mangus v. Ashley,*

199 W.Va. 651, 658, 487 S.E.2d 309, 316 (1997) (" ' "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." ' " (quoting *Martin v. Randolph County Bd. of Educ.,* 195 W.Va. 297, 312, 465 S.E.2d 399, 414 (1995) (quoting *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992) (citations omitted)))); *State ex rel. Ballard v. Vest,* 136 W.Va. 80, 87, 65 S.E.2d 649, 653 (1951) ("We cannot assume in the absence of wording clearly indicating contrariwise that the Legislature would use words which are unnecessary, and use them in such way as to obscure, rather than clarify, the purposes which it had in mind in the enactment of the statute.").

Here we are faced with a rather unique situation: the word "patient" is statutorily defined, but the word "person" is not. Pursuant to W.Va.Code § 55–7B–2(e), " '[p]atient' " refers to "a natural person who receives or should have received health care from a licensed health care provider under a contract, expressed or implied." Absent a pertinent statutory definition for "person," [9]

---

9. We refer to a "pertinent statutory definition" given the nature of the case presently before us. In giving effect to a word employed in a legislative enactment, "[i]t is a fundamental principle of statutory construction that the meaning of a word cannot be determined in isolation, but it must be drawn from the context in which it is used." *West Virginia Health Care Cost Review Auth. v. Boone Mem'l Hosp.,* 196 W.Va. 326, 338, 472 S.E.2d 411, 423 (1996) (citations omitted). Additionally, "[i]n the interpretation of statutes, words and phrases therein are often limited in meaning and effect, by necessary implications arising from other words or clauses thereof." Syl. pt. 5, *Ex parte Watson,* 82 W.Va. 201, 95 S.E. 648 (1918). With respect to the case *sub judice,* the Legislature has implicitly specified that the meaning of the word "person" in the MPLA refers to individuals rather than to corporate or governmental entities that also qualify as "persons" in certain instances. *See, e.g.,* W.Va.Code § 55–7B–1 ("The Legislature hereby finds and declares that the *citizens of this state* are entitled to the best medical care and facilities available and that health care providers offer an essential and basic service which requires that the public policy of this state encourage and facilitate the provision of such service to our *citizens* [.]" (emphasis added)). *Cf.* W.Va.Code § 2–2–10(i) (1989) (Repl.Vol.1994) (indicating that "[t]he word 'person' ... shall include corporations, so-

cieties, associations and partnerships, if not restricted by the context," but also recognizing that such definition does not apply if "a different intent on the part of the Legislature be apparent from the context"); *State v. Zain,* 207 W.Va. 54, 528 S.E.2d 748 (1999) (observing that "person" may include the State of West Virginia and county commissions); *Daily Gazette Co., Inc. v. West Virginia Dev. Office,* 206 W.Va. 51, 521 S.E.2d 543 (1999) (according "person" status to news corporation); *Board of Educ. of Lewis County v. West Virginia Human Rights Comm'n,* 182 W.Va. 41, 385 S.E.2d 637 (1989) (finding county board of education to be a "person"); *State ex rel. Wheeling Downs Racing Ass'n v. Perry,* 148 W.Va. 68, 132 S.E.2d 922 (1963) (including corporations within definition of "person"). Any other construction of the term "person," particularly that found in W.Va.Code § 2–2–10(i), would produce an absurd result herein given the expressed Legislative purpose in enacting the MPLA. *See, e.g., Expedited Transp. Sys., Inc. v. Vieweg,* 207 W.Va. 90, 98, 529 S.E.2d 110, 118 (2000) ("It is the 'duty of this Court to avoid whenever possible a construction of a statute which leads to absurd, inconsistent, unjust or unreasonable results.'" (quoting *State v. Kerns,* 183 W.Va. 130, 135, 394 S.E.2d 532, 537 (1990)) (emphasis omitted)). *Accord* Syl. pt. 2, *Newhart v. Pennybacker,* 120 W.Va. 774, 200 S.E. 350 (1938) ("Where a particular construction of a statute would result in

however, we must resort to the commonly accepted meaning of this word.

"Each word of a statute should be given some effect and a statute must be construed in accordance with the import of its language. Undefined words and terms used in a legislative enactment will be given their common, ordinary and accepted meaning." Syllabus point 6, in part, *State ex rel. Cohen v. Manchin*, 175 W.Va. 525, 336 S.E.2d 171 (1984).

Syl. pt. 2, *State v. Snodgrass*, 207 W.Va. 631, 535 S.E.2d 475 (2000). *Accord* Syl. pt. 3, in part, *Ohio Cellular RSA Ltd. P'ship v. Board of Pub. Works of West Virginia*, 198 W.Va. 416, 481 S.E.2d 722 (1996) ("In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning." (internal quotations and citations omitted)); Syl. pt. 4, *State v. General Daniel Morgan Post No. 548, V.F.W.*, 144 W.Va. 137, 107 S.E.2d 353 (1959) ("Generally the words of a statute are to be given their ordinary and familiar significance and meaning, and regard is to be had for their general and proper use.").

"The natural and obvious meaning of the word 'person' is a living human being." *Massachusetts v. Welosky*, 276 Mass. 398, 404, 177 N.E. 656, 659 (1931) (internal quotations and citations omitted). It is "a generic word of comprehensive nature ... [that] includes human beings[.]" *Illinois v. Guzzar-*

do, 4 Ill.App.2d 355, 360, 124 N.E.2d 39, 41 (1955) (citations omitted). *Accord In re Searight's Estate*, 87 Ohio App. 417, 426, 95 N.E.2d 779, 784 (1950) (defining person as "[a] human being" (internal quotations and citation omitted)). Other authorities similarly define "person" as "a human being,"[10] "[a]n individual human being; a man, woman, or child,"[11] and "a human being as distinguished from an animal or a thing."[12] The common theme throughout all of these definitions is the interpretation of a "person" as a human being, without further qualification. By contrast, the Legislature has defined a "patient" as a person, *i.e.*, human being, who has received, or should have received, "health care from a licensed health care provider." *See* W.Va.Code § 55–7B–2(e). Because the general term "person" does not contain such a restriction or limitation, we conclude that the Legislature intended the words "person" and "patient" to refer to two distinct classifications of individuals, *e.g.*, individuals generally and those individuals who have obtained medical care.

Given this differentiation in terminology, it is apparent that the Legislature intended to allow individuals generally to recover damages for injuries attributable to medical professional liability regardless of whether they are actually "patients".[13] Accordingly, we hold that the West Virginia Medical Professional Liability Act, W.Va.

an absurdity, some other reasonable construction, which will not produce such absurdity, will be made."). Therefore, although this State's jurisprudence is replete with references to the statutory definition of the word "person" as it is defined in W.Va.Code § 2–2–10(i), there nevertheless exists a noticeable dearth of authority for a more simplistic and fundamental explanation of this term as it is used in the definition of "medical professional liability" by W.Va.Code § 55–7B–2(d) (1986) (Repl.Vol.2000). Accordingly, we will look to other tribunals for guidance in formulating a definition of "person" as it is used in the context of the MPLA.

10. Black's Law Dictionary 1142 (6th ed.1990) (citations omitted).

11. VII The Oxford English Dictionary 724 (1970).

12. Random House Webster's Unabridged Dictionary 1445 (2d ed.1998).

13. In support of their position that the MPLA does not permit a third party cause of action, the defendants rely upon this Court's prior statement of dicta in *Rand v. Miller*, 185 W.Va. 705, 706, 408 S.E.2d 655, 656 (1991), to the effect that "[t]he essence of a medical malpractice action is a physician-patient relationship." Despite this pronouncement, however, we are also guided by our recent holding in *State ex rel. Weirton Medical Center v. Mazzone*, which counsels that "[t]he provisions of the Medical Professional Liability Act, W.Va.Code §§ 55–7B–1 to –11 (1986), govern actions falling within its parameters[.]" Syl. pt. 3, in part, 2002 WL 1359317, —— W.Va. ——, —— S.E.2d —— (No. 30360 June 19, 2002). Thus, we adhere to the conclusion reached in the instant proceeding that the MPLA does not preclude a non-patient from bringing a cause of action for injuries occasioned by medical negligence.

Code § 55–7B–1, *et seq.,* permits a third party to bring a cause of action against a health care provider for foreseeable injuries that were proximately caused by the health care provider's negligent treatment of a tortfeasor patient.[14] The manner in which such a third party plaintiff may proceed with such an action is further governed by the requirements of the MPLA. "The provisions of the Medical Professional Liability Act, W.Va. Code §§ 55–7B–1 to –11 (1986), govern actions falling within its parameters[.]" Syl. pt. 3, in part, *State ex rel. Weirton Med. Ctr. v. Mazzone,* 2002 WL 1359317, — W.Va. —, — S.E.2d — (No. 30360 June 19, 2002). Therefore, we hold further that, in order to maintain a third party action under the West Virginia Medical Professional Liability Act, a plaintiff must establish the elements of proof contained in W.Va.Code § 55–7B–3 (1986) (Repl.Vol.2000).[15]

For the foregoing reasons, then, we answer in the affirmative the certified question posited by the district court. However, such third party cause of action must conform to the MPLA's requirements for the prosecution of medical professional liability claims generally.

## IV.

## CONCLUSION

In conclusion, we answer the question certified by the United States District Court for the Southern District of West Virginia in the affirmative. The West Virginia Medical Professional Liability Act, W.Va.Code § 55–7B–1, *et seq.,* does permit a third party to bring a cause of action against a health care provider for foreseeable injuries that were proximately caused by the health care provider's negligent treatment of a tortfeasor patient. However, in order to maintain such a third party action under the MPLA, the plaintiff must establish the elements of proof contained in W.Va.Code § 55–7B–3 (1986) (Repl.Vol.2000).

Certified Question Answered.

MAYNARD, Justice, dissenting.

(Filed July 8, 2002)

It is not easy for me to dissent to the majority opinion. My sympathy for the plaintiffs in light of their terrible suffering naturally causes me to want to see them compensated for their injuries. The law, however, simply does not provide for recovery in every instance of tragedy. Regardless of how badly I want the plaintiffs to recover, and I do, I cannot concur with the majority's holding and remain intellectually honest in determining the scope of the Medical Professional Liability Act ("MPLA").

I disagree with the majority opinion for several reasons. First, I do not agree that the language of the MPLA supports the conclusion reached by the majority. The statute in question defines "medical professional liability" as "any liability for damages resulting from the death or injury of a *person* for any tort or breach of contract based on health care services rendered, or which should have been rendered, by a health care provider or health care facility to a *patient.*" W.Va.Code § 55–7B–2(d) (emphasis added). The majority contends that the Legislature's use of the word "person" is a deliberate decision to

---

**14.** This result is consistent with other provisions of the MPLA which refer to claims by persons as opposed to patients. *See, e.g.,* W.Va.Code § 55–7B–1 (explaining purpose of MPLA to be, in part, the "provi[sion of] adequate and reasonable compensation to those *persons* who suffer from injury or death as a result of professional negligence" (emphasis added)); W.Va.Code § 55–7B–4(a) (1986) (Repl.Vol.2000) (establishing statute of limitations for "[a] cause of action for injury to a *person* alleging medical professional liability against a health care provider" (emphasis added)); W.Va.Code § 55–7B–11 (1986) (Repl.Vol. 2000) (explaining severability procedure "[i]f any provision of this article or the application thereof to any *person* or circumstance is held invalid" (emphasis added)).

**15.** Although not necessary to the resolution of the instant certified question, we note with approval the district court's ultimate conclusion that a third party cause of action was appropriate under the facts of the case *sub judice* and its finding that the plaintiffs had satisfied the elements of proof requisite thereto. In particular, we agree that the duration of Mr. Hoosier's and Dr. Srichai's seventeen year physician-patient relationship; Dr. Srichai's knowledge of Mr. Hoosier's prescription drug dependency; and objective evidence of Mr. Hoosier's substance and medication abuse as a result of his numerous arrests for D.U.I. supported the plaintiffs' claims for relief.

"allow individuals generally to recover damages for injuries attributable to medical professional liability regardless of whether they are actually 'patients.'"

Under the common law of this State, a physician-patient relationship was required to maintain a medical malpractice action. *See, e.g., Weaver v. Union Carbide Corp.,* 180 W.Va. 556, 378 S.E.2d 105 (1989); *Sisson v. Seneca Mental Health Council,* 185 W.Va. 33, 404 S.E.2d 425 (1991); *Gooch v. West Virginia Dept. of Public Safety,* 195 W.Va. 357, 465 S.E.2d 628 (1995); *Rand v. Miller,* 185 W.Va. 705, 408 S.E.2d 655 (1991). This Court has previously said, "In determining the meaning of a statute, it will be presumed, in the absence of words therein, specifically indicating the contrary, that the Legislature did not intend to innovate upon, unsettle, disregard, alter or violate ... the common law[.]" Syllabus Point 27, *Coal & Coke Ry. Co. v. Conley,* 67 W.Va. 129, 67 S.E. 613 (1910). Further, "[o]ne of the axioms of statutory construction is that a statute will be read in context with the common law unless it clearly appears from the statute that the purpose of the statute was to change the common law." Syllabus Point 2, *Smith v. West Virginia State Board of Education,* 170 W.Va. 593, 295 S.E.2d 680 (1982). Despite the majority's claim to the contrary, it certainly is not clear from the text of the MPLA that the Legislature intended to change the common law insofar as it required a doctor-patient relationship. Had the Legislature truly intended to provide for third-party suits against health care providers under the MPLA, I am confident it would have set forth its intent in express and explicit language instead of leaving it to this Court to guess at its intent from clues buried in its use of the terms "person" and "patient."

This is especially so when one considers that the majority's interpretation is so contrary to the purposes of the MPLA. According to W.Va.Code § 55–7B–1, the Legislature intended to control the costs of medical malpractice insurance while maintaining adequate compensation for persons injured as the result of medical negligence. It is downright absurd to believe that the Legislature sought to achieve this purpose by increasing exponentially the potential liability of health care providers. *See* Syllabus Point 2, *Newhart v. Pennybacker,* 120 W.Va. 774, 200 S.E. 350 (1938) ("Where a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made."). In short, the majority opinion disregards the applicable rules of statutory construction to arrive at an interpretation of the MPLA that is clearly inimical to its purposes.

Second, I believe the majority opinion ignores longstanding principles of tort law. In that infamous old first year law school case of *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), Justice Cardozo explained that negligence is a matter of a relation between the parties and must be founded upon the foreseeability of harm to the person in fact injured. Dr. Srichai had absolutely no relation to the third-party plaintiffs who were injured and thus no legal obligation to them. Nevertheless, the majority finds that it was foreseeable that Dr. Srichai's negligent treatment of his patient could injure these third-party plaintiffs who were completely unidentified at the time Dr. Srichai treated his patient.

Third, I am deeply concerned about the impact of the majority opinion. It is plain to me that our State is suffering a medical malpractice insurance crisis. For reasons that are vehemently disputed, doctors are unable to find affordable malpractice insurance. As a result, a significant number of doctors have retired or shut down their practices and moved to other states. Newspapers and broadcast media are full of stories about rural communities without adequate medical care due to the insurance crisis. Even larger cities like Charleston and Huntington may experience a lack of doctors who practice certain medical specialties. The Legislature has responded by taking some steps to ensure that West Virginians have access to adequate affordable health care. In contrast, this Court responds by dramatically and significantly *expanding* the liability of health care providers. Regardless of the cause or causes of the present crisis, it cannot be denied that the majority opinion likely will result in more medical malpractice suits. This in turn, will cause further increases in

medical malpractice premiums. Obviously, this can only aggravate the current crisis.

I will say that the majority opinion is very carefully and tightly written. The majority no doubt genuinely believes this rule will have no broad application but will apply only to the facts of this case and a scarce few similar cases. I simply do not agree. Rather, I am convinced that the scope and consequences of the majority opinion cannot be exaggerated. Every doctor in West Virginia who prescribes any type of medication to a patient is now potentially liable to countless unknown third parties because of that prescription.

Moreover, every car accident case in which the driver at fault is currently under the care of a doctor or who is being treated with a prescription medication could now result in a medical malpractice action. This means that in every single auto accident case, the plaintiff's attorney has a duty to investigate to ascertain if the defendant driver was taking any prescription medications or was under any type of medical care. If so, the plaintiff's attorney then must ascertain whether the defendant driver's physician properly warned him or her about all the direct and side effects of each and every medicine prescribed. And with what result?

Let us say that the defendant is taking a beta blocker for high blood pressure or a prescription antihistamine for a cold or allergy, both of which are common drugs daily taken by millions of Americans. Either one of these medications can slow reaction time or cause drowsiness which, incidentally, is a side effect of thousands of prescription drugs. If the physician who prescribes the medication fails to tell the patient of these side effects and the patient subsequently causes an auto accident, would the physician likely be sued? Clearly, I believe that he or she would.

In the world of real litigation, there exists the all-too-common practice of a few lawyers suing every possible defendant, some on remote theories of negligence, simply to add these defendants to the pool of payers. This, in turn, enables these lawyers to coerce these defendants into contributing to the overall settlement. Proponents of the majority opinion may argue that this will not happen as a result of this case. Sadly, I think it will. I further believe that it will dramatically increase the cost of litigating medical malpractice cases. The risk of such litigation is simply an unreasonable burden to place on the backs of physicians, insurers, and, of course, patients. It is, after all, patients, not doctors or insurance companies, who ultimately pay the bills!

In conclusion, the majority disregards the applicable rules of statutory construction, the common law, and historical principles of tort law and expands health care provider liability at a time when health care providers, for whatever reasons, cannot find affordable medical malpractice insurance. The tired, worn out cliche and oft-cited legal maxim, "hard cases make bad law" is certainly true of the majority opinion in this case. The majority has used the very sad and tragic facts of this case to make law that is bad for every West Virginian who needs or who may need affordable health care in the future. Accordingly, I reluctantly and respectfully dissent.